582 F.2d 135
 98 L.R.R.M. (BNA) 3150, 84 Lab.Cas. P 10,688
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Shopmen's Local Union No. 455, International Association of
Bridge, Structural and Ornamental Iron Workers,
AFL-CIO, Intervenor,
v.
INDEPENDENT ASSOCIATION OF STEEL FABRICATORS, INC., Achilles
Construction Co., Inc., Greenpoint Ornamental and Structural
Iron Works, Inc., Heuser Iron Works, Inc., Ikenson Iron
Works, Inc., Kuno Steel Products Corp., Long Island Steel
Products Co., Master Iron Craft Corp., Melto Metal Products
Co., Inc., Mohawk Steel Fabricators, Inc., the Peele
Company, Roman Iron Works, Inc., Spigner and Sons Structural
Steel Co., Inc., S. Cervenka and Sons, Inc., Paxton
Metalcraft Corp., Division of Apex Industries, Inc., Koenig
Iron Works, Inc., Trojan Steel Corp., G. Zaffino and Sons,
Inc. and Roma Iron Works, Inc., Respondents,
and
Local 810, International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America,
AFL-CIO, Intervenor.
 No. 850, Docket 77-4198.
 United States Court of Appeals,
Second Circuit.
 Argued April 10, 1978.
Decided June 30, 1978.
 
 Standau E. Weinbrecht, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., of counsel), for petitioner.
 Stanley Israel, New York City (Bluestone, Kliegman & Israel, New York City, of counsel), for respondents except Heuser Iron Works, Spigner & Sons, and Local 455.
 Belle Harper, New York City (Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, of counsel), for intervenor Local 455.
 Robert M. Ziskin, Great Neck, N. Y. (Mirkin, Barre, Saltzstein & Gordon, P. C., and Robert M. Saltzstein, Great Neck, N. Y., of counsel), for intervenor Local 810.
 Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.
 GURFEIN, Circuit Judge:
 
 
 1
 The NLRB petitions for enforcement of an order issued against a multi-employer bargaining group, the Independent Association of Steel Fabricators, Inc. ("Association"), and eighteen of its employer members who are part of the steel fabricating and erecting industry in the metropolitan New York area. The Board found that the Association and certain of the named members had committed unfair labor practices by unlawfully attempting to assist the Sheet Metal, Alloys and Hardware Fabricators and Warehousemen, Local 810, International Brotherhood of Teamsters ("Local 810") to supplant Shopmen's Local Union 455, International Association of Bridge, Structural and Ornamental Workers, AFL-CIO ("Local 455") as representative of the members' production and maintenance employees. The Board found further that certain of the named members of the Association had violated the National Labor Relations Act by unilaterally withdrawing bargaining authorization from the Association during negotiations with Local 455 and by declining to execute an agreement negotiated by five members remaining in the Association. Certain respondents were also held to have unlawfully executed contracts with Local 810 at a time when they were obligated to bargain with Local 455.
 
 THE HISTORY OF THE CONTROVERSY
 
 2
 Before 1975, some employers in the steel construction and fabrication industry in metropolitan New York whose employees were represented by Local 455 had bargained with that union as members of a multi-employer association, Allied Building Metal Industries, Inc. ("Allied").[1] Other employers, including all of respondents here involved, had negotiated individual independent contracts with Local 455. Although the wage and employee benefit funds contribution provisions were essentially the same for all industry employers,[2] a number of differences between the independent standard contract and the Allied contract had evolved over the course of successive negotiations. When the existing contracts expired on July 1, 1975, there were some fifty-six differences between the individual contracts and the Allied contract concerning matters such as overtime pay and contract coverage of plant clericals, almost all of which worked to the advantage of the Allied members who were in competition with the independents.
 
 
 3
 In early 1975, before the individual contracts expired, these fifty-odd disparities, coupled with the depressed state of the construction industry, impelled twenty-five employers having standard independent contracts with Local 455 to form a trade association, the Independent Association of Steel Fabricators. One of the Association's primary functions was to negotiate with Local 455 and other unions, with the ultimate objective of achieving parity with Allied members. On June 10, the Association furnished Local 455 with bargaining authorization from thirty-two employers and the union subsequently recognized the new Association as bargaining agent for all but four of those employers.[3]
 
 
 4
 Bargaining between Local 455 and the Association occurred in three phases: (1) four sessions between June 10 and July 1, the date the contracts expired and union employees went out on strike; (2) four or five sessions between late August and early October; and (3) a single meeting on January 14, 1976. There was a hiatus in negotiations between July 1 and late August and again between October and mid-January.
 
 
 5
 In the four bargaining sessions in June, discussion focused on the Association's interest in eliminating the fifty-six disparities between the individual contracts and the Allied contract. The union failed to present any specific wage or fund contribution proposals until the final June 30 meeting. At that meeting, Local 455 President Colavito advised the Association that the union was seeking a 15% Wage increase and 5% Fund increase from Allied but did not address the fifty-six disparities. The Association countered with a draft contract based on the previous Allied contract which eliminated the disparities mentioned and included a wage increase. Colavito rejected the proposed draft as totally unacceptable.
 
 
 6
 On the next day, July 1, 1975, Local 455 struck all employers who had not signed new contracts. At the same time, it circulated a proposed stipulation reducing its requested wage increase from 15 to 10% And modifying certain other demands. On the basis of that proposal, the union negotiated settlements with certain independent nonaffiliated employers and one Association member, Dextra, during the summer of 1975. There were no further meetings between the Association and the union until late August.
 
 
 7
 During the hiatus in negotiations, the Association learned that one of its members, Dextra, had consummated a collective bargaining agreement with Local 455. Upon the ground that the By-Laws of the Association required six months advance notice of a member's resignation, the Association petitioned the New York Supreme Court for a temporary injunction to prevent Dextra's resignation and its entry into an individual collective bargaining agreement with the union. In addition, the Association filed an unfair labor practice charge with the Board, alleging an intent on the part of Local 455 to destroy the multi-employer bargaining unit in violation of §§ 8(b)(3) and 8(b)(1)(B) of the Act, 29 U.S.C. §§ 158(b)(3), 158(b)(1)(B). The state court declined to grant preliminary relief and the NLRB Region 2 Director issued a no-action letter dated November 21, 1975, in which he stated that, as of June 30, 1975, "a legitimate impasse was reached" and that therefore Dextra was entitled to negotiate with the union on an individual basis.[4]
 
 
 8
 Local 455 and the Association met once in late August and sporadically in September and October under the auspices of the State Mediation Service. At the late August negotiating session, Local 455 formally presented the Association with its July proposal, which it had also presented to Allied. Since the union had made no concessions over the course of the negotiations from August through October concerning the fifty-six disparities, the parties made little progress. Several members of the Association, Atwater, North Shore, and Charla Iron Works, withdrew during this period with the consent of Local 455.[5]
 
 
 9
 In October, the Association's labor relations adviser Brickman indicated at an open meeting of the Association that there might be other unions interested in representing its members' employees. Under circumstances to be discussed more fully below, Local 810 of the Teamsters contacted certain respondents and their employees and, between November of 1975 and February of 1976, nine members of the Association signed collective bargaining agreements with Local 810.[6]
 
 
 10
 Local 455 finally reached a settlement with Allied in early January 1976. Thereafter, on January 14, Local 455 met with the Association's negotiating committee and offered it the same basic wage and fund settlement that had been reached with Allied, but with the other provisions of the former standard independent contract remaining intact. Again there was no offer by Local 455 to eliminate the disparities. The Association countered with an offer to recommend to its membership the precise contract negotiated with Allied. Colavito categorically refused and the meeting ended.
 
 
 11
 Two days later, on January 16, the Association wrote to the union that nineteen of its members had withdrawn bargaining authorization from the Association.[7] The union received the letter on January 19. By letter dated January 20, Colavito informed the Association that the union did not consent to the withdrawals. He insisted further that any agreement worked out between the union and the Association would be binding on the withdrawing members. By the time the union was notified of the withdrawals through the January 16 letter, six member employers had already signed agreements with Local 810.
 
 
 12
 Several days later, on January 23, the union met at the State Mediation Board with three employers who had not withdrawn. They made it clear to the union negotiator that they were not authorized to speak on behalf of the Association. Colavito responded that, as far as he was concerned, the members present did represent the Association. After all-day negotiations, the parties reached agreement on a general stipulation but deferred signature pending resolution of certain problems unique to particular employers. At two meetings in late January, five employers signed the January 23 stipulation. Although they refused to sign On behalf of the Association, they added to their signatures, at Colavito's insistence, that they were members of the Association.
 
 
 13
 During the next two months, while the strike continued against non-signatories, Local 455 sent two sets of letters to the employers who had withdrawn from the Association, one requesting them to implement the agreement represented by the January 23 stipulation and another requesting reinstatement of the striking employees. Of the nineteen employers who had withdrawn, two, Trojan Steel and Heuser Iron, did execute agreements identical to the January 23 stipulation and reinstated their employees. The seventeen other employers who had withdrawn by letter received January 19 fall into three classes: (1) those who had signed with Local 810 before January 19; (2) those who signed with Local 810 only after the January 19 notice; and (3) those who signed with neither Local 455 nor Local 810.[8]
 
 THE BOARD'S FINDINGS
 
 14
 The preceding facts gave rise to four separate charges of unfair labor practices by Local 455 against the respondent Association and the named employers, as well as a charge filed by Local 810 against Local 455 alleging various acts of violence and unlawful coercion. The four charges, consolidated into a single amended complaint, were heard together with the Local 810 counter-charge before an Administrative Law Judge. His principal findings of fact and conclusions of law were adopted by the Board in a decision dated August 11, 1977.[9] They were essentially as follows:
 
 
 15
 (1) By soliciting their employees to abandon Local 455 and join Local 810, certain respondent employers and the respondent Association had engaged in unfair labor practices within the meaning of §§ 8(a)(1), (2), and (5) of the Act;[10]
 
 
 16
 (2) By threatening to close their plants and/or discharge their employees in order to induce them to join Local 810, certain respondent employers had violated § 8(a)(1) of the Act;[11]
 
 
 17
 (3) By withdrawing from multi-employer bargaining and by refusing to acquiesce in the union's demand that they execute the January 23 agreement, the Association and respondents (except for Trojan and Heuser) violated and were violating §§ 8(a)(5) and (1) of the Act;
 
 
 18
 (4) By discharging their employees for supporting Local 455 and refusing to reinstate them upon their unconditional offer to return to work, respondent employers (except for Trojan and Heuser) had violated and were violating §§ 8(a)(3) and (1) of the Act.
 
 
 19
 As to the counter-charge, the Administrative Law Judge found:
 
 
 20
 By blocking ingress to respondent employer's plant, threatening to inflict physical harm on respondent's employees, and coercively photographing employees as they crossed Local 455 picket lines, Local 455 had violated and was violating § 8(b)(1)(A) of the Act.[12]
 
 THE ORDER OF THE BOARD
 
 21
 In ordering the employers to cease and desist from the above unfair labor practices, the Board ordered Inter alia that: (1) all members (except Trojan and Heuser) must implement the January 23 collective bargaining agreement and reinstate all striking employees; (2) all employers (except Roma Iron Works and Cervenka and Sons) must cease withholding authorization from the Association to bargain collectively and to execute an agreement on their behalf with Local 455; (3) all employers who had negotiated collective bargaining agreements with Local 810 must cease recognition of Local 810 as the bargaining representative of their production and maintenance employees and must cease giving effect to the collective bargaining agreement with Local 810 or any renewal thereof, unless and until Local 810 is certified by the Board as the exclusive bargaining agent of their employees.
 
 
 22
 * ASSISTANCE TO LOCAL 810
 
 
 23
 A. Individual Employer Assistance to Local 810 as a Violation of Sections 8(a) (1) and (2)
 
 
 24
 Section 8(a), 29 U.S.C. § 158(a), of the NLRA provides:
 
 
 25
 "(a) It shall be an unfair labor practice for an employer
 
 
 26
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 
 
 27
 "(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . . ."
 
 
 28
 The Board found that seven respondent employers:[13] (1) Long Island, (2) Greenpoint, (3) Roma, (4) Paxton, (5) Trojan, (6) Zaffino and (7) Master, had solicited their employees to join Local 810 in violation of §§ 8(a)(1) and (2) of the Act.[14] Except as to Master, we believe that the Board's findings are supported by substantial evidence on the record as a whole, and we accept them accordingly. Universal Camera Corp. v. N.L.R.B. 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 29
 Indeed, these respondents (except for Master) do not seriously challenge the finding that they rendered assistance and support to Local 810 of the Teamsters. The record establishes that the presidents of Paxton, Long Island and Zaffino expressly requested their employees to join Local 810. Greenpoint president Geuther promised one employee a 10% wage increase if he would change unions, and reassured two others that their pension rights would travel with them if they joined Local 810. The employees of Roma and Zaffino were similarly advised that they would not lose any benefits by joining the Teamsters. Beyond that, the presidents of Roma and Zaffino personally drove some of their employees to Local 810 headquarters and the presidents of Greenpoint and Long Island offered to do so.[15]
 
 
 30
 These overt attempts to induce employees to abandon Local 455 and join Local 810 plainly constitute interference and support within the meaning of §§ 8(a) (1) and (2). See International Ass'n of Machinists v. N.L.R.B.,311 U.S. 72, 78-79, 61 S.Ct. 83, 85 L.Ed. 50 (1940); N.L.R.B. v. Triumph Curing Center, 571 F.2d 462, 470 (9th Cir. 1978); N.L.R.B. v. Park Edge Sheridan Meats, Inc., 323 F.2d 956, 958-59 (2d Cir. 1963).
 
 
 31
 It is also a violation of § 8(a)(1) for an employer to threaten economic reprisal in order to influence its employee's choice of a bargaining representative. Although an employer may indicate what it reasonably believes will be the likely consequences of selecting a particular union if the consequences predicted are beyond its control, it may not threaten to take economic measures of its own volition in retaliation for its employees' selection, N.L.R.B. v. Gissell Packing Co., 395 U.S. 575, 618-19, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); N.L.R.B. v. River Togs, Inc., 382 F.2d 198, 202 (2d Cir. 1967), or seek to divert employees from the recognized union to another, Irving Air Chute Co. v. N.L.R.B., 350 F.2d 176, 179-81 (2d Cir. 1965). Here there was ample factual support for the Board's finding that certain employers made coercive statements concerning events within their control.[16]
 
 
 32
 With respect to Master, however, we do not find substantial evidence on the record as a whole to support the Board's finding of unfair labor practices. The only evidence concerning Master's alleged violations of §§ 8(a)(1) and (2) was testimony by a single employee that in mid-February of 1976, while on strike, he had asked for work and was informed that Master had signed with Local 810. There was no evidence suggesting that Master had engaged in conduct designed to assist Local 810 before it withdrew from multi-employer bargaining. For the reasons discussed in Parts II and III Infra, we cannot conclude on this record that it was an unfair labor practice for Master to have signed with Local 810 after January 19 and to have related that fact to its employee.
 
 
 33
 B. Association Assistance to Local 810 as a Violation of Sections 8(a)(1) and (2), and (5)
 
 
 34
 At an open meeting of the Association in October of 1975, the Association's labor relations adviser, attorney Herman Brickman, suggested that unions other than Local 455 might be interested in representing the members' employees. Brickman was at that time the arbitrator in certain contracts between Local 810 and various industry employers. In response to Brickman's suggestion, the membership authorized him to contact other unions. At subsequent open meetings, Brickman reported that Local 810 was in the process of contacting the members' production and maintenance employees.
 
 
 35
 In November, the Association invited Dennis Silverman, president of Local 810, to address an open meeting of the membership and other industry employers. Silverman focused on the advantages Local 810 could offer both the employers and employees with respect to pensions, hospitalization and employment conditions. At about the same time, two members of the Association's negotiating committee obtained from Local 810 headquarters a copy of one of its labor contracts. After copies of the Local 810 contract somehow became available to the Association members, one of the negotiators commented on the substance of certain Local 810 provisions to interested employers.
 
 
 36
 The Board found that such activity by the Association constituted unlawful assistance to a non-incumbent union in violation of §§ 8(a)(1), (2) and (5) of the Act.[17] Respondents' only serious challenge to this finding is that the Administrative Law Judge erred in admitting and relying on allegedly privileged statements by Brickman to the Association. The Administrative Law Judge ruled that Brickman's statements were not protected by the attorney-client privilege because they were made at a meeting attended by non-members of the Association.[18] Relying on United States v. Bigos,459 F.2d 639 (1st Cir.), Cert. denied sub nom. Raimondi v. United States,409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972), respondents contend that the presence of non-clients at the Association meetings would vitiate the privilege only if that presence were indicative of an intent that the communication not be confidential. Such an intent, they submit, is absent here. Although we question whether statements made at an open meeting attended by non-member employers could reasonably have been intended as confidential, we conclude that there was sufficient other evidence of unlawful assistance apart from Brickman's statements to sustain the § 8(a) (1) violation. By inviting the president of a non-incumbent union to address the Association and by commenting on that union's contract provisions, the Association's agents plainly gave support to a labor organization in violation of § 8(a)(2) and in derogation of an existing bargaining relationship protected by §§ 8(a)(1) and (5). See N.L.R.B. v. Getlan Iron Works, Inc., 377 F.2d 894, 896 (2d Cir. 1967); N.L.R.B. v. Fotochrome, Inc., 343 F.2d 631, 632-33 (2d Cir.), Cert. denied, 382 U.S. 833, 86 S.Ct. 76, 15 L.Ed.2d 76 (1965).
 
 II
 WITHDRAWAL FROM THE ASSOCIATION IMPASSE
 
 37
 The rule in this circuit is that once negotiations have begun, a member's attempt to withdraw from a multi-employer bargaining unit is " 'untimely' and therefore ineffectual to relieve him from the obligations of any agreement that is ultimately reached, absent special circumstances or consent by the union." N.L.R.B. v. John J. Corbett Press,401 F.2d 673, 675 (2d Cir. 1968). Accord, N.L.R.B. v. Sheridan Creations, Inc., 357 F.2d 245 (2d Cir. 1966), Cert. denied, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967).
 
 
 38
 The questions we face here are: (1) whether an impasse constitutes such a special circumstance as to justify unilateral withdrawal; (2) whether an impasse in negotiations in fact occurred; and (3) whether notice to the union of withdrawal is a prerequisite to its effectiveness.
 
 
 39
 In this circuit, we have never directly ruled on an actual impasse situation as it affects the withdrawal rights of a member of a multi-employer bargaining unit.[19] The policy considerations involved are easy to formulate but difficult to reconcile. The rule against untimely withdrawal is designed to preserve the stability of multi-employer bargaining which would be impaired if an employer could withdraw whenever it found the results of such bargaining uncongenial or if it felt that it could use the threat of withdrawal as bargaining leverage. See N.L.R.B. v. Sheridan Creations, Inc., supra,357 F.2d at 248. By the same token, however, the objectives of collective bargaining would be ill-served by compelling employers to remain in the bargaining unit once it becomes clear that no progress is being made within that framework. Thus, all the circuits which have addressed the issue have concluded that a genuine impasse in negotiations will justify an employer's unilateral withdrawal from multi-employer bargaining. N.L.R.B. v. Beck Engraving Co., 522 F.2d 475 (3d Cir. 1975); N.L.R.B. v. Hi-Way Billboards, Inc., 500 F.2d 181 (5th Cir. 1974); Fairmont Foods Co. v. N.L.R.B., 471 F.2d 1170 (8th Cir. 1972). See N.L.R.B. v. Associated Shower Door Co., 512 F.2d 230, 232 (9th Cir.), Cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975) (dictum).
 
 
 40
 As Mr. Justice Brennan observed, speaking for the Court in N.L.R.B. v. Truck Drivers Local Union No. 449 (Buffalo Linen Supply Co.),353 U.S. 87, 96, 77 S.Ct. 643, 647-48, 1 L.Ed.2d 676, 682 (1957):
 
 
 41
 "Conflict may arise, for example, between the right to strike and the interest of small employers in preserving multi-employer bargaining as a means of bargaining on an equal basis with a large union and avoiding the competitive disadvantages resulting from nonuniform contractual terms. The ultimate problem is the balancing of the conflicting legitimate interests."
 
 
 42
 We strike that balance by now joining our sister circuits in holding that an impasse will justify a party's unilateral withdrawal from multi-employer negotiations. And, while the balance in national labor policy is entrusted primarily to the NLRB, the courts of appeals are not entirely without power of review when the "record amply supports the conclusion that the parties were at loggerheads" at the time when a member withdraws from multi-employer bargaining despite a finding to the contrary by the Board. N.L.R.B. v. Beck Engraving Co., supra, 522 F.2d at 484 (reversing the Board's conclusion that there was no impasse); See N.L.R.B. v. Hi-Way Billboards, Inc., supra, 500 F.2d 181 (reversing Board's finding that impasse is akin to hiatus in negotiations.) In view of the history of this labor dispute, the conclusion is inescapable that negotiations had reached an impasse on January 19 when the union received the withdrawal letter signed by nineteen members of the Association.
 
 
 43
 The Association here was formed because the small independent employers felt that they were at a disadvantage in bargaining individually with Local 455 as was evident from their consistent failure to obtain as good a contract as Allied. Multi-employer bargaining is recognized as a means of achieving bargaining equality for the employers. Buffalo Linen Supply Co., supra, 353 U.S. at 96, 77 S.Ct. 643. When the union refused to budge on any of the fifty-odd differences between the independent contracts and the Allied contract, it was akin to an affirmation that the Association was useless as a bargaining device.
 
 
 44
 After the strike began on July 1, 1975, the parties did not meet at all until late August. We agree with the Region 2 Director's finding, made in response to the Association's complaint against Dextra, that as of June 30 a "legitimate impasse was reached" and that Dextra withdrew "subsequent to a collapse of negotiations."[20]
 
 
 45
 Between late August and January 14, the parties had only four or five negotiating sessions. As the Administrative Law Judge acknowledged, there was "little or no progress during those meetings." He noted as well that the fifty-odd contract disparities was a cardinal issue in the negotiations.
 
 
 46
 That Local 455 agreed to negotiate separately with four former members of the Association during the August to January interval (Dextra, Atwater, North Shore, and Charla) is also indicative of the inability of the union and the Association to engage in fruitful discussion. Moreover, although the union did not selectively picket or otherwise pressure any particular member, its willingness to negotiate separately with several members had something of a whipsaw effect on the remaining members who watched certain of their withdrawing competitors resume business while they themselves were still in the throes of an economic strike. Cf. N.L.R.B. v. Association Shower Door, Supra, 512 F.2d at 232; N.L.R.B. v. Beck Engraving, supra, 522 F.2d at 482-83; N.L.R.B. v. Hi-Way Billboards, supra, 500 F.2d at 183.[21]
 
 
 47
 Although acknowledging the possibility that an impasse existed during July and early August, and again in the fall of 1975, the Board concluded, nevertheless, that Local 455 had broken the impasse in August by circulating a revised proposal to the Association and that any subsequent impasse was broken when the parties met in January after the union had reached a settlement with Allied. That analysis overlooks one salient fact. At neither the August nor the January meeting did Local 455 make any concessions concerning the single most important issue in dispute, the elimination of disparities between the Association and Allied contracts. It is true that Local 455 presented a modified proposal at the August meeting and a more complete proposal in January after the Allied contract was consummated. But not every shift in position signifies progress, especially if it is unresponsive to the principal issue in contention. See Plumbers & Steamfitters Union No. 323, 191 N.L.R.B. 592, 594 (1971).[22] When, at the January 14 meeting, the union categorically rejected the Association's offer to provide the same contractual terms as Allied, Association members could well have concluded that "there was no realistic prospect that continuation of discussion at that time would have been fruitful," which is a working definition of impasse. American Federation of Television and Radio Artists v. N.L.R.B., 129 U.S.App.D.C. 399, 405, 395 F.2d 622, 628 (1968). See N.L.R.B. v. Hi-Way Billboards, Inc., 473 F.2d 649 (5th Cir. 1973).
 
 
 48
 Moreover, contrary to the Board's finding, there is no substantial evidence that when the parties left the January 14 meeting they had agreed to meet again. Union President Colavito testified only that the state mediator closed the January 14 session with the observation that "there is no sense in going any further today," which Colavito took to mean "(w)e would be called by the mediator concerning the next meeting." Apart from that ambiguous statement by the mediator, there was no evidence that the parties intended to resume discussion.
 
 
 49
 Indeed, two days later, on January 16, the Association sent notice to the union that nineteen employers had withdrawn bargaining authorization from the Association. The union received the notice on the 19th. At that point, the strike had lasted for six and a half months and the prospects for settlement were less encouraging than in cases where employers' claims of impasse have been rejected.[23] That the union and the five employers remaining in the Association reached a settlement shortly after the majority withdrawal does not militate against a finding of impasse on January 19, since the withdrawal might well have heightened willingness to reach an accord, See N.L.R.B. v. Beck Engraving Co., supra, 522 F.2d at 484-85.
 
 
 50
 Nor is the circumstance that five members remained in the Association of major significance. Nineteen members had withdrawn, eleven of whom had neither assisted nor at that point signed contracts with Local 810. Realism compels us to conclude, as did the Tenth Circuit in N.L.R.B. v. Southwestern Colorado Contractors Association, 447 F.2d 968, 969 (1971) that:
 
 
 51
 "The reduction by nearly fifty percent of a small multiemployer bargaining unit certainly acknowledges to a considerable degree the practical frustration of the original unit as a bargaining entity."
 
 
 52
 And see Connell Typesetting Co., 212 N.L.R.B. 918 (1974).[24]
 
 
 53
 Since we find that the Association members were entitled to withdraw in view of the impasse in negotiations, it is unnecessary to consider respondents' contentions that there were other "unusual circumstances" warranting their departure such as dire economic conditions and alleged surface bargaining on the part of Local 455.
 
 
 54
 A question, however, remains as to whether notice of withdrawal is required before it can become effective. Nineteen respondents signed the letter dated January 16, received January 19, indicating that they had withdrawn bargaining authorization from the Association. Six of these respondents had already in effect withdrawn Without notice by executing contracts with Local 810.[25] The stability of labor relations requires that such tacit withdrawals without notice be viewed as ineffectual.
 
 
 55
 The Board has consistently taken the position that withdrawal from multi-employer bargaining is effective only when unequivocally communicated to the other party. Goodsell & Vocke, Inc., 223 N.L.R.B. 60, 66 (1976), Enforced, 559 F.2d 1141 (9th Cir. 1977); Pomona Building Materials Co., 174 N.L.R.B. 558, 560 (1969), Enforced, 73 L.L.R.M. 2944 (9th Cir. 1970). At least one circuit has taken the same view, N.L.R.B. v. Dover Tavern Owners' Association, 412 F.2d 725, 728 n.7 (3d Cir. 1969), and two others have indicated in dicta that companies withdrawing from multi-employer bargaining in the face of an impasse must give unequivocal notice to the union. N.L.R.B. v. Association Shower Door, Inc., supra, 512 F.2d at 232; N.L.R.B. v. Central Plumbing, supra, 492 F.2d at 1255. We decline to endorse a different rule here.
 
 
 56
 For an employer to withdraw bargaining authorization from a multi-employer association without notifying the union is not simply a breach of etiquette. Such tacit withdrawal not only withholds knowledge from the union about the composition of the bargaining unit, but also deprives it of the opportunity either to initiate independent negotiations with the withdrawing party or to file a complaint promptly with the Board. To abrogate the notice requirement when one party leaves multi-employer bargaining in the face of an impasse would interject a further element of uncertainty into a negotiating context already destabilized by withdrawal.[26]
 
 
 57
 We conclude therefore that respondents' withdrawal from multi-employer bargaining was not effective until communicated to the union. Accordingly, those employers who signed union security contracts with Local 810 prior to January 19 violated § 8(a)(5) by disabling themselves from bargaining with the union recognized by the Association.
 
 III
 THE REFUSAL TO BARGAIN
 
 58
 Two questions remain. First, were respondents bound, in spite of their withdrawal, to the terms of the stipulation of settlement negotiated by five members remaining in the Association? Second, were those respondents who did not violate § 8(a)(5) by signing an agreement with Local 810 before January 19 under any obligation to bargain individually with Local 455 after their withdrawal?
 
 
 59
 The Board found all respondents, except Trojan and Heuser, guilty of § 8(a) (5) violations and ordered them to execute the January 23 stipulation. We refuse to enforce this part of the Board's order since the signatories of the stipulation made it clear that they were not signing on behalf of the Association. There was neither an agency in fact nor an apparent agency relation between the minority of the Association who signed and the majority who withdrew; the union was on notice that the signers had disavowed any agency relationship. The effort of the president of Local 455 unilaterally to resurrect the corpse of the Association was in this context unavailing. See N.L.R.B. v. Southwestern Colorado Contractors Association, supra, 447 F.2d 968. Even those employers who may be subject to a bargaining order for § 8(a) (5) violations cannot be forced to execute the January 23 stipulation. It is not within the power of the Board, in these circumstances, to dictate substantive contractual terms to which neither an employer nor its agent has acceded. H. K. Porter Co. v. N.L.R.B., 397 U.S. 99, 108, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). See N.L.R.B. v. Burns International Security Services, Inc., 406 U.S. 272, 281-82, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).
 
 
 60
 Though respondents cannot be held to the terms of the stipulation as ordered by the Board, a question remains as to the status of Local 455 as the bargaining agent for their employees. In this case, respondents fall into three main groupings: (1) those employers[27] who signed with Local 810 before giving notice of withdrawal; (2) those employers[28] who signed with Local 810 after giving notice of withdrawal; (3) those employers[29] who gave notice of withdrawal but did not sign an agreement with either union.[30]
 
 
 61
 For the reasons discussed in the preceding section, we hold that the first class of employers, by executing contracts with Local 810 before communicating their withdrawal to Local 455, are guilty of a refusal to bargain. With respect to the second class, who properly withdrew and served notice upon the union before signing with Local 810, the critical question is whether they had any obligation after withdrawal to bargain separately with Local 455. The same issue, of course, arises as to the third class of employers, who gave timely notice and signed with neither union.
 
 
 62
 There is no holding squarely in point.[31] The Board had not certified Local 455 as the bargaining agent for respondents' employees within the year of the withdrawal. The union was not, therefore, entitled to a conclusive presumption that it enjoyed majority status among the employees. Cf. N.L.R.B. v. Burns International Security Services, supra, 406 U.S. at 279 n.3, 92 S.Ct. 1571; Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). It had, however, been recognized as the bargaining agent for the production and maintenance employees for many years. As the incumbent union, it was, we believe, entitled to a rebuttable presumption of continued majority status for a reasonable interval after the individual contracts expired on June 30. See N.L.R.B. v. Cayuga Crushed Stone, Inc., 474 F.2d 1380, 1383 (2d Cir. 1973); N.L.R.B. v. Newspapers, Inc., 515 F.2d 334, 341 n.13 (5th Cir. 1975). Employers charged with a refusal to bargain could rebut the presumption by introducing evidence that the union did not in fact have majority support when their refusal occurred or that their refusal was founded on a good faith doubt of the union's majority status. N.L.R.B. v. Windham Community Memorial Hospital, 577 F.2d 805, 810-11 (2d Cir. 1978); Retired Persons Pharmacy v. N.L.R.B., 519 F.2d 486, 489 (2d Cir. 1975).[32]
 
 
 63
 The added difficulty here, however, is that the union apparently never elected to request bargaining with the individual employers. It chose, instead, to stand upon its position that the withdrawing employers were bound by the stipulation signed by the minority. Since the union offered no alternative, we cannot conclude on this record that the failure to arrive at individual agreements with Local 455 by those respondents who withdrew with notice was the result of the individual employers' refusal to bargain. Cf. Flomatic Corp., 147 N.L.R.B. 1304, 1305 (1964), Enf. granted in part, denied in part, 347 F.2d 74, 76 (2d Cir. 1965). Hence, the employers in class three, who signed with neither union, did not violate § 8(a)(5).[33]
 
 
 64
 So far as respondents in the second class are concerned, since they intended to sign with some union, we believe that they were under a duty to seek bargaining with Local 455 on an individual basis before negotiating with Local 810. Their execution of agreements with Local 810 constituted a refusal to bargain which is excusable only if, at the time of execution, Local 455 had lost its majority or the employers had a rational basis for doubting its majority. In the absence of evidence as to good faith doubt or actual loss of majority status, the Board may find respondents in class two guilty of a refusal to bargain. See N.L.R.B. v. Beck Engraving, supra, 522 F.2d at 485; N.L.R.B. v. Windham Community Memorial Hospital, supra, 577 F.2d at 810; Retired Persons Pharmacy, supra, 519 F.2d at 489.[34]
 
 
 65
 We find unavailing respondents' contention that Local 455's misconduct should bar entry of a bargaining order in its behalf under the rule of Laura Modes Co., 144 N.L.R.B. 1592 (1963). The Administrative Law Judge's rejection of the Laura Modes defense rested in large part on his reconciliation of disputed factual accounts and on credibility determinations which we are reluctant to disturb. See N.L.R.B. v. Columbia University, 541 F.2d 922, 928 (2d Cir. 1976); N.L.R.B. v. Dinion Coil Co., 201 F.2d 484, 490 (2d Cir. 1952). Whether the union's conduct was, on the whole, of such a character as to warrant the withholding of a bargaining order is a question peculiarly within the Board's expertise. Donovan v. N.L.R.B., 520 F.2d 1316, 1321, 1323 (2d Cir. 1975), Cert. denied, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976). We defer to its assessment here. However, in view of the fact that the unfair labor practices did not taint election machinery, and because of the lapse of time and our lack of information concerning current labor relations in the industry, we believe that the Board should have an opportunity to consider whether an election rather than an order to bargain with Local 455 might be a more appropriate sanction for the § 8(a)(5) violations here involved. Cf. N.L.R.B. v. Gissel Packing Co., supra, 395 U.S. at 610-18, 89 S.Ct. 1918. Accordingly, we enforce those portions of the Board's order requiring respondents in class one to cease recognition of, and to abrogate their contracts with, Local 810 unless and until it is certified. We leave to the Board's discretion whether to impose a bargaining order on respondents in class one and on any respondents in class two who are guilty of § 8(a)(5) violations.
 
 IV
 REINSTATEMENT AND DISCHARGE
 
 66
 A strike begun in support of economic objectives may be converted to an unfair labor practice strike by an employer's violation of the Act, and unfair labor practice strikers are entitled to reinstatement upon their unconditional offer to return to work. Mastro Plastics Corp. v. N.L.R.B.,350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956); N.L.R.B. v. Fitzgerald Mills Corp., 313 F.2d 260, 269 (2d Cir.), Cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963). The Board reasoned that various employers' threats of discharge and the signing of collective bargaining agreements with Local 810, together with the general refusal to bargain with Local 455 after withdrawal from the Association, converted the strike against all respondents into an unfair labor practice strike by January 16 at the latest. The Board viewed Colavito's letters requesting reinstatement as satisfying the unconditional offer to return to work requirement, and concluded, therefore, that each respondent's refusal to reinstate its striking employees upon receipt of the letter was violative of §§ 8(a)(3) and (1) of the Act.[35] Given our legitimation of certain respondents' withdrawal from multi-employer bargaining and our recognition of possible good-faith defenses to the refusal to bargain charges, it follows that not all respondents' employees became unfair labor practice strikers. We would, nevertheless, have enforced the Board's reinstatement order against those employers guilty of §§ 8(a)(1), (2) and (5) violations, N.L.R.B. v. Milco, Inc., 388 F.2d 133, 139 (2d Cir. 1968), if the record had reflected an unconditional offer to return to work. We are constrained to hold, however, that there is inadequate support for a finding that the offer to return to work was unconditional.
 
 
 67
 During February and March of 1976, the union sent a uniform letter to all respondents requesting that their employees "unconditionally return to work," but each letter was accompanied by another letter demanding that the employers implement the January 23 stipulation. Testimony by the union's business representative Matienzo confirmed the obvious inference to be drawn from the pairing of those letters, I. e., that union workers were prepared to return to work only if their employers signed the January 23 "contract" with Local 455. Since the record establishes no offer to return to work which was in fact, as well as form, unconditional, and since the Board made no finding that such a request would have been futile under the circumstances, N.L.R.B. v. Comfort, Inc., 365 F.2d 867, 877-78 (8th Cir. 1966), respondents' employees are not entitled to reinstatement as unfair labor practice strikers. H. & F. Binch Company Plant v. N.L.R.B., 456 F.2d 357, 363-64 (2d Cir. 1972); Moore Business Forms, Inc., 224 N.L.R.B. 393, 409 (1976).
 
 
 68
 For similar reasons, we cannot enforce the Board's reinstatement order against Greenpoint and Long Island on the theory that they discharged economic strikers prior to finding replacements. Although such conduct is plainly violative of §§ 8(a)(1) and (3) of the Act, N.L.R.B. v. International Van Lines, 409 U.S. 48, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972),[36] the Board's settled rule is that"(e)mployees who are discharged while on strike also must indicate abandonment of the strike and a willingness to return to work, in order to establish their right to their jobs and resumption of wages unless there is a showing that such application would be rejected, i. e., that it would have been futile."
 
 
 69
 Astro Electronics, Inc., 188 N.L.R.B. 572, 573 (1971) (footnotes ommitted). See Penzel Construction Co., 185 N.L.R.B. 544 (1970), Enforced, 449 F.2d 148 (8th Cir. 1971). Here there was no proof of an unconditional offer to return to work and no showing of futility.
 
 VII
 REMEDIES
 
 70
 1. Substantial evidence supports the Board's findings that the Association violated §§ 8(a)(1), (2) and (5) of the Act and that Roma, Greenpoint, Long Island, Paxton, Zaffino and Trojan violated §§ 8(a)(1) and (2) by interfering with their employees' selection of a bargaining representative and by rendering unlawful assistance to Local 810. We accordingly grant enforcement of those portions of the Board's order requiring them to cease and desist from such unfair labor practices.
 
 
 71
 2. We refuse enforcement of the order against all respondents (except Trojan and Heuser) directing them to implement the terms of the January 23 stipulation negotiated by five members of the Association.
 
 
 72
 3. Roman, Long Island, Melto, Mohawk, Greenpoint, and Paxton, all of whom signed contracts with Local 810 before January 19 are guilty of a refusal to bargain with Local 455. We grant enforcement of those provisions of the Board's order requiring them: (a) to cease recognizing Local 810 as the bargaining representative of their production and maintenance employees unless and until it shall have been certified as the exclusive representative of such employees; (b) to abrogate their collective bargaining agreements with Local 810 and any extensions thereof unless and until Local 810 is certified; and (c) to reimburse any of their present and former employees for dues paid to Local 810 pursuant to the unlawful contracts.
 
 
 73
 Enforcement granted in part, denied in part, as set forth in this opinion.[37]
 
 
 
 [1]
 Local 455 also represented employees of various New York manufacturers of metal and wire products who bargained through the Wire Works Manufacturers Association. In a companion case to this one, the NLRB petitions for enforcement of its order against one member of that Association, Acme Wire Works, Inc., based on Acme's refusal to execute a contract negotiated between Local 455 and the Wire Works Manufacturers Association, N.L.R.B. v. Acme Wire Works, Inc., 582 F.2d 153 (2d Cir. 1978). In an opinion filed herewith, we grant enforcement
 
 
 [2]
 In negotiating with the independents, the union had prepared stipulations proposing changes in the previous standard independent contract. Usually the stipulations submitted to the independents had specified the wages and benefits for the first year of the contract and had provided that wage and benefit provisions for the second and third years would match those negotiated with Allied. The Allied settlement had also governed the amounts that the independent employers would contribute to jointly administered health, welfare, pension and fringe benefit funds
 
 
 [3]
 Local 455 objected to the inclusion of Balfour and Company, Esco Iron, Penner Company and Weatherguard Service on grounds that it had already commenced negotiations with those companies on an individual basis. Balfour, Esco and Penner subsequently signed standard independent contracts with Local 455; Weatherguard went out of business or was absorbed by another company having a contract with Local 455
 
 
 [4]
 Respondents' Exhibit 8
 
 
 [5]
 The union expressly acquiesced in the withdrawals by Dextra in August and Atwater in October or November but filed charges protesting the withdrawals by Charla and North Shore Fabricators. The Regional Director declined to issue a complaint in either case on finding that the union had agreed to negotiate with Charla on a separate basis after its withdrawal in August and to negotiate with North Shore after its withdrawal in September. Local 455's determination to file charges after having initially agreed to bargain separately is perhaps explained by the fact that Local 819, IBT, filed petitions requesting elections among Charla's and North Shore's production and maintenance employees shortly after those two companies had withdrawn from the Association
 
 
 [6]
 These employers were: Roman Iron Works (November 18); Greenpoint Ornamental (November 20); Paxton Metalcraft (December 5); Melto Metal Products (December 22); Long Island Steel (January 6); Mohawk Steel (January 9); Master Iron Craft (January 28); Koenig Iron Works (January 30); Cervenka and Sons (February 17)
 
 
 [7]
 The employers listed were Achilles Construction, Bay Iron, Esco Iron, Greenpoint Ornamental, Heuser Iron, Ikenson Iron, Koenig Iron, Kuno Steel, Long Island Steel, Master Iron Craft, Melto Metal, Mohawk Steel, Paxton Metalcraft, Peele Company, Roman Iron Works, Spigner and Sons, Trojan Steel, Weatherguard Service, and Zaffino and Sons. Two of these employers, Esco Iron and Weatherguard Service, were not made respondents in this proceeding because Local 455 had never considered them part of the Association; See note 3 Supra. Bay Iron was also not made a party. In addition to the other sixteen withdrawing employers, two members of the Association, who did not sign the January 16 letter, are named as respondents herein, Cervenka and Sons which signed a contract with Local 810 in February of 1976, and Roma Iron Works which signed with neither Local 810 nor Local 455 but which allegedly rendered unlawful assistance to Local 810
 
 
 [8]
 The employers falling into each category are listed in notes 27-29 Infra
 
 
 [9]
 The Board's decision is reported at 231 N.L.R.B. No. 31. In adopting the decision of the Administrative Law Judge, the Board noted that it did not rely on the Administrative Law Judge's conclusion that withdrawal of authorization to bargain of itself constituted a violation of § 8(a)(5) of the Act. Rather, the Board took the position that untimely withdrawal followed by the employer's refusal to acquiesce in the union's demand that bargaining continue in the multi-employer unit together formed the basis for a § 8(a)(5) refusal to bargain. The Board also disapproved the Administrative Law Judge's intimation that the unfair labor practices of the Association and its members contributed to the finding of untimely withdrawal. The Board concluded that withdrawal would have been untimely and ineffective even if there had been no unfair labor practices
 
 
 [10]
 These employers were: Greenpoint, Paxton, Long Island, Master, Roma, Zaffino, and Trojan
 
 
 [11]
 These employers were: Greenpoint, Roma, Trojan, Long Island, and Zaffino
 
 
 [12]
 Section 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A) provides that:
 "(b) It shall be an unfair labor practice for a labor organization or its agents
 "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title . . . ."
 The Board does not seek enforcement of that portion of its order issued against Local 455 since the union has voluntarily complied with its provisions.
 
 
 [13]
 Although in paragraph 7 of his conclusions of law the Administrative Law Judge listed Cervenka and Sons as one of the employers who had solicited his employees to join Local 810, he made no findings of acts of solicitation or support by Cervenka. Nor did he make Cervenka the subject of "cease and desist" provisions concerning support of Local 810 as he did with the other named employers. Accordingly, we do not consider Cervenka and Sons as having rendered assistance to Local 810 in violation of §§ 8(a)(1) and (2)
 
 
 [14]
 The Board also found that these respondents violated § 8(a)(5) of the Act. We reserve our discussion of those alleged violations for Part III of the opinion
 
 
 [15]
 Respondent Zaffino argues that the Administrative Law Judge erred in finding that it was president Zaffino rather than one of his employees who suggested that the employees accompany him to Local 810 headquarters. It is unnecessary to determine at whose initiative the ride occurred since there was testimony that on other occasions Zaffino had offered to take employees to Local 810 headquarters
 
 
 [16]
 The presidents of Greenpoint and Trojan told employees that they would not work so long as they remained members of Local 455 or refused to join Local 810. Employees of Trojan, Roma and Long Island were informed that their employers would never sign with Local 455. The presidents of Long Island, Roma and Zaffino indicated that they might close their plants if their employees remained with Local 455
 
 
 [17]
 Section 8(a)(5), 29 U.S.C. § 158(a) of the Act provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees . . . ."
 
 
 [18]
 Alternatively, the Administrative Law Judge concluded that since the statements referred to an ongoing illegality, the privilege did not attach. In respondents' view, Brickman's statements fell short of counseling illicit activities and hence did not fall within the common-law exception to the attorney-client privilege. Since, as we note in the text, there is sufficient other evidence of the Association's support of Local 810, we find it unnecessary to determine whether Brickman's statements forfeited their privileged status because they contemplated the commission of unfair labor practices. Cf. Matter of Doe, 551 F.2d 899, 900-01 (2d Cir. 1977); United States v. Bob, 106 F.2d 37 (2d Cir.), Cert. denied, 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493 (1939)
 
 
 [19]
 By considering, although rejecting, an employer's claim of impasse in John J. Corbett Press, supra, 401 F.2d at 675, we did at least inferentially suggest that a genuine impasse in negotiations might justify an employer's unilateral withdrawal
 
 
 [20]
 Letter from Region 2 Director to Independent Association of Steel Fabricators (November 21, 1975), Respondents' Exhibit 8
 
 
 [21]
 As the Ninth Circuit has noted, one of the reasons for accepting impasse as a justification for an employer's unilateral withdrawal is that "(w)ere the rule otherwise, a union could reach an agreement with one or more employers and then whipsaw the remaining members of the significantly fragmented and weakened multi-employer unit," Associated Shower Door, supra, 512 F.2d at 232
 
 
 [22]
 While it may be true, as the Administrative Law Judge concluded, that there was "movement" in the parties' positions at the January 14 meeting, a shift in position will not of itself signify the end of an impasse unless it appears that further discussion would be fruitful. Here, in view of the union's intransigence concerning the Allied contract disparities, its January 16 tender of a more complete proposal is without significance
 
 
 [23]
 See, e. g., N.L.R.B. v. Central Plumbing Co., 492 F.2d 1252 (6th Cir. 1974) (parties negotiating under terms of agreement); N.L.R.B. v. Corbett Press, supra, 401 F.2d at 675 (negotiations, though "somewhat protracted, were continuing normally")
 
 
 [24]
 Nor is it significant that respondents failed to attribute their withdrawal to an impasse in their January 16 letter to the union. In the context of this labor dispute, respondents' invocation of the impasse doctrine does not appear to be an "afterthought," Cf. N.L.R.B. v. Tulsa Sheet Metal Workers, Inc., 367 F.2d 55, 58 (10th Cir. 1966)
 
 
 [25]
 Roman (November 18); Greenpoint (November 20); Paxton (December 15); Melto (December 22); Long Island (January 6); Mohawk (January 9)
 
 
 [26]
 The notice requirement may also be necessary to prevent disingenuous invocations of the impasse doctrine. As the facts in Acme Wire Works, see note 1 Supra, suggest, abrogation of the notice requirement might encourage employers to claim retrospectively that they had withdrawn in the face of an impasse and to support their assertion by a letter dated but not delivered during a hiatus in negotiation. See 582 F.2d at 157-158
 
 
 [27]
 Roman (November 18); Greenpoint (November 20); Paxton (December 15); Melto (December 22); Long Island (January 6); Mohawk (January 9)
 
 
 [28]
 Master (January 28) and Koenig (January 30)
 
 
 [29]
 Zaffino, Ikenson, Achilles, Kuno, Peele and Spigner. The Administrative Law Judge found that, as of the time of hearing, two of these employers, Spigner and Ikenson, were no longer in a business requiring use of the kind of production and maintenance workers belonging to Local 455. The Board's order as modified herein will be applicable to them only if they resume operations requiring such employees
 
 
 [30]
 Of the remaining respondents, two, Trojan and Heuser, ultimately executed contracts with Local 455. Two others, Roma and Cervenka, did not sign the January 16 letter notifying the union of their withdrawal. Although as we noted in the preceding section, notice is a prerequisite to a valid withdrawal from an extant multi-employer association, we do not attach significance to Cervenka's and Roma's failure to give notice that they were withdrawing bargaining authorization from an Association which had effectively collapsed after the majority's withdrawal. Thus Roma, who signed with neither union, may be considered part of class three; Cervenka, who signed with Local 810 on February 17, may be included in class two
 
 
 [31]
 In Beck, the Third Circuit implied that a withdrawing employer had an obligation to bargain individually with the union recognized by the multi-employer association, but declined to sustain the refusal to bargain charges because the particular employer involved had had a good faith doubt as to the union's majority status at the time of withdrawal, 522 F.2d at 485. Thus, the Beck court's analysis suggests that a good faith doubt can determine the nature of the obligation to bargain anew, which is the approach we have adopted here
 
 
 [32]
 A good faith doubt is, in effect, a doubt with a rational basis in fact for believing that the union does not enjoy majority support. N.L.R.B. v. Rish Equipment Co., 407 F.2d 1098, 1100-01 (4th Cir. 1969). Once an employer advances some credible basis for doubt, the General Counsel has the burden of establishing that the refusal to bargain was in fact improperly motivated. N.L.R.B. v. River Togs, supra, 382 F.2d at 206; N.L.R.B. v. Great Atlantic & Pacific Tea Co., 346 F.2d 936, 939-40 (5th Cir. 1965)
 
 
 [33]
 Although two of these employers, Roma and Zaffino, assisted Local 810 in violation of §§ 8(a)(1) and (2), the commission of such unfair labor practices does not of itself establish a refusal to deal. See Gissel Packing Co., supra, 395 U.S. at 615, 89 S.Ct. 1918. And although §§ 8(a)(1) and (2) violations may in some instances be so substantial as to warrant a bargaining order, See Gissel, supra, 395 U.S. at 610-16, 89 S.Ct. 1918; N.L.R.B. v. River Togs, supra, 382 F.2d at 208, the Board did not so find here, and we decline to impose a bargaining order on that basis
 
 
 [34]
 We think that the Board erred in its handling of the four respondents who introduced evidence at the hearing with regard to their good faith doubt of Local 455's majority status when they signed with Local 810. Two of these employers, Mohawk and Paxton, executed contracts with Local 810 before giving notice of withdrawal. The other two employers, Koenig and Master, signed after notice. The Board considered all four to be barred from a good faith defense on the ground that even if all thirty employees of these four employers had changed allegiance, nevertheless, since 250 union workers were employed in the aggregate by members of the Association, the question of majority status was to be determined by whether Local 455 had a majority of the whole unit
 For the reasons advanced in Part II, we disagree with the Board's fundamental premise that the multi-employer unit remained intact. We agree however that the two employers in class one, Mohawk and Paxton, could not lawfully execute contracts with Local 810 prior to communicating their withdrawal from an association which had recognized Local 455. These employers thus violated § 8(a)(5) regardless of any shift in loyalties among their own employees at the time of execution. The Board is, of course, free to consider such evidence concerning employee allegiance in determining whether an election rather than a bargaining order would at this point be a more appropriate sanction. See p. 151 Infra. With respect to Koenig and Master, the Board erred in refusing to consider evidence of their good faith doubt of Local 455's majority status.
 
 
 [35]
 Section 8(a)(3), 29 U.S.C. § 158(a)(3), provides that it shall be an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."
 
 
 [36]
 We do not find persuasive respondents' assertion that the statements to Greenpoint and Long Island employees to the effect that if they did not join Local 810 they might be replaced or they should "look for another job" were predictions of discharge rather than actual discharges. Under the circumstances, the employees could properly infer that they had in fact been discharged. N.L.R.B. v. Comfort, Inc., supra, 365 F.2d at 875
 
 
 [37]
 We would normally remand in this case for further development of facts based on this opinion. Since so much time has now elapsed, however, we must assume that there may presently be continuing relationships of which we are unaware. We shall, accordingly, not formally remand but leave it to the parties to petition the NLRB for such evidentiary hearings, if any, that they desire under the principles outlined in this opinion