**WESTMINSTER GRAPHICS, INC., Plaintiff,**

v.

**NEW YORK TYPOGRAPHICAL UNION NO. 6, Defendant.**

**No. 76 C 1231.**

United States District Court, E. D. New York.

May 20, 1980.

Clifton Budd Burke & DeMaria, New York City by Howard G. Estock, David I. Rosen, New York City, for plaintiff.

John J. Sheehan, New York City, for defendant.

**MEMORANDUM AND ORDER**

NEAHER, District Judge.

This action by an employer for a stay of arbitration of an asserted labor controversy is alleged to arise under the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* ("Act"). Jurisdiction is premised on § 301 of the Act, 29 U.S.C. § 185. The parties have cross-moved for summary judgment upon a stipulation of uncontested facts that reveals the following:

In or about June 1975, defendant New York Typographical Union No. 6 ("Union") notified the Printers League Section, Printing Industries of Metropolitan New York, Inc. ("Printers League") that it wished to negotiate a new collective bargaining agreement to replace the one then in effect,

which was scheduled to expire on October 4, 1975. The Printers League then represented plaintiff, among other employers, in a multi-employer collective bargaining group.

Prior to the commencement of negotiations on July 5, 1975, the Printers League sent the Union a list ("First List") of employers it would represent during the negotiations. Plaintiff was among those listed. Negotiations led to a proposed agreement in early December 1975, which the negotiating parties agreed to take back to their respective memberships for ratification. Although the Union's members eventually ratified the proposed agreement on December 21, 1975, the membership of the Printers League rejected it and instructed the negotiating committee to return to the bargaining table and seek certain concessions.

At a meeting on or about December 16, 1975, the Printers League informed the Union of its position. At that meeting, or shortly thereafter, the Union's president, Bertram Powers, notified the League that the Union would make no changes in the proposed agreement and would proceed to sign up, on a non-League basis, those individual member employers of the League who wished to accept the proposed agreement. Thereafter, certain members of the Printers League accepted its terms and signed individual agreements with the Union. Plaintiff did not.

In view of the foregoing development, the Printers League subsequently requested all its members on the First List who wished to accept the proposed agreement to execute new authorization cards for the purpose of permitting the League to sign the agreement on behalf of those members authorizing it to do so. Plaintiff did not execute such an authorization card.

Thereafter, the Printers League informed the Union that it would sign a multi-employer collective bargaining agreement without identifying which employers would be party to that agreement. The Union, however, was subsequently notified on January 20, 1976, of the names of those employers who agreed to be bound by the multi-employer contract. That list did not include the name of plaintiff. The agreement signed between the Union and the League was the same agreement the Union's members had ratified on December 21, 1975 (Stip. of Facts ¶ 8).

Following the agreement noted above and receipt of the authorization forms of those employers wishing to be bound by the agreement, the Printers League sent the Union a new or Second List of employers, some but not all of whom had been on the First List, who on January 19, 1976, had ratified and agreed to be bound by the agreement and who then constituted a new multi-employer group. The Second List did not include the name of plaintiff. The Union accepted this list of members as constituting a new multi-employer bargaining group (Stip. of Facts ¶¶ 9, 10).

Prior to January 19, 1976, neither plaintiff nor the Printers League had notified the Union that plaintiff no longer authorized the League to represent it. No separate agreement was at any time executed by plaintiff and defendant.

Although the parties have agreed on the above statement of facts, they diverge in their interpretations of these facts. Plaintiff views the issue before the court as whether it agreed to become a member of an entirely different multi-employer group which ultimately adopted the contract with the Union. Plaintiff claims that, while it was a member of the Printers League group which negotiated to impasse with the Union (it was on the First List), it declined to join the new multi-employer bargaining group in response to the Printers League inquiry by letter dated January 13, 1976 (Pl. Exh. C), and thus was not bound by the agreement reached by the Printers League on behalf of "Second List" members and the Union.

For its part, the Union contends plaintiff is bound by the agreement which the Union ratified on December 21, 1975, and the Printers League ratified on January 19, 1976. It claims neither plaintiff nor the Printers League notified the Union at any time from the beginning of negotiations in July 1975 to January 20, 1976, when the

Printers League sent the Union the "Second List," that plaintiff had withdrawn or intended to withdraw from the multi-employer bargaining unit. Thus, the Union argues, plaintiff failed to withdraw effectively from the multi-employer bargaining unit and is therefore bound by its actions or inactions and those of its representative, the Printers League, notwithstanding any intention to do otherwise.

We are not persuaded by defendant's fundamental contention that the rights and obligations of the parties became fixed on January 19, 1976, the date the Printers League *ratified* the collective bargaining agreement on behalf of its members, and that plaintiff is bound because the Union did not receive notice that plaintiff had not authorized the League to sign the agreement on its behalf until a day later, January 20, 1976. This position is too narrow and ignores the parties' course of conduct *after* the Printers League ratified the contract.

By letter dated January 20, 1976, to Bertram Powers, the Union's president, James E. Horne, executive vice-president of the League stated in relevant part that:

"Based on the authority of the special meeting of the Printers League held on Monday, January 19, 1976, to consider the adoption by the League of a multi-employer contract with New York Typographical Union No. 6, I advise you, that in accordance with the Constitution and By-Laws of the Printers League, I am empowered to offer to New York Typographical Union No. 6, as a multi-employer contract proposal, the terms and conditions which are contained in the attached booklet.

"*The League makes such offer on behalf of those firms which have authorized it to do so.* The names and addresses of these firms are contained in the attached listing.

"I look forward to hearing from you with respect to this offer of a Printers League contract with the New York Typographical Union No. 6. . . ." (Pl. Exh. A; emphasis supplied.)

And in a second letter dated March 1, 1976, Horne wrote Powers to

"confirm the substance of our recent conversations with respect to the nature of the collective bargaining agreement between Printers League Section and your Union.

"*That contract was duly ratified by Printers League Section on behalf of those members of Printers League Section which, in writing, authorized the League to bind them to that contract on a multi-employer basis.* Your Union had previously ratified the substantive terms of that contract, but was not, at the time, committing itself to the proposition that it was a multi-employer contract.

"I now understand that your Union recognizes that the contract is, in fact and in law, a consensually established multi-employer contract between the League and its members (as described above) on the one hand and your Union on the other hand . . . ." (Pl. Exh. B; emphasis supplied.)

Although defendant accuses plaintiff of self-serving characterizations of the Printers League January 19th ratification as an "offer," the letters quoted at length above belie such a contention. First, the letters were drafted apparently long before the dispute between these parties arose; the letter of January 20th was written shortly after the Printers League ratification. Second, there can be little doubt, no matter how the letters are characterized, that defendant was given notice that the list of employers who authorized the Printers League to bind them in a new agreement did not include plaintiff. This notice also afforded defendant ample opportunity to reject the proposed agreement on any ground, among them, perhaps, that the Printers League failed to obtain plaintiff's authorization.

Plaintiff has supported its motion for summary judgment with the affidavit of Horne, which states in part that several days after mailing his letter of January 20th to Powers, Horne spoke to Powers who indicated that he would accept a multi-em-

ployer relationship (Horne Aff. ¶ 14). This affidavit is unanswered in any material respect and, in fact, is embodied in the parties' stipulation of facts (Stip. ¶ 10). This documentation establishes that defendant had notice of the new Second List of Printers League members, which did not include plaintiff, and nonetheless agreed to accept the agreement without the inclusion of plaintiff. In these circumstances, defendant's contention that the parties were bound at the moment the Printers League ratified the agreement on behalf of certain members rather than after exchanges of assent to the new arrangement is myopic at best. It ignores the parties' substantial course of dealings after their respective memberships ratified the agreement and defies common sense.

Finally, this conclusion is consistent with defendant's citation of authority concerning withdrawal of parties from multi-employer bargaining units. In *Retail Associates, Inc.*, 120 N.L.R.B. 388, 395 (1958), for example, the N.L.R.B. stated:

> "We would accordingly refuse to permit the withdrawal of an employer or a union from a duly established multiemployer bargaining unit, except upon adequate written notice given prior to the date set by the contract for modification, or to the agreed-upon date to begin the multiemployer negotiations. *Where actual bargaining negotiations based on the existing multiemployer unit have begun, we would not permit, except on mutual consent, an abandonment of the unit which each side has committed itself to the other, absent unusual circumstances.*" (Emphasis supplied.)

See also *N.L.R.B. v. Independent Ass'n of Steel Fabricators*, 582 F.2d 135, 145–46 (2d Cir. 1978); *N.L.R.B. v. John J. Corbett Press, Inc.*, 401 F.2d 673, 675 (2d Cir. 1968); *N.L.R.B. v. Sheridan Creations, Inc.*, 357 F.2d 245 (2d Cir. 1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967). In the view we take of this action, defendant's acceptance of the agreement at a time the Union knew or should have known plaintiff had not authorized the Printers League to bind it, and plaintiff in fact did not agree to be bound by the agreement, amounts to its consent to plaintiff's withdrawal from the original bargaining unit.

Accordingly, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied.

SO ORDERED.