681 F.2d 130
 110 L.R.R.M. (BNA) 2995, 94 Lab.Cas. P 13,629
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
KOENIG IRON WORKS, INC.; Master Iron Craft Corp.; Roman Iron
Works, Inc.; Mohawk Steel Fabricators, Inc.; Melto Metal
Products Co., Inc.; Greenpoint Ornamental and Structural
Iron Works, Inc.; Paxton Metalcraft Corp.; and Long Island
Steel Products Co., Respondents.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
ZAFFINO & SONS, INC.; Mohawk Steel Fabricators, Inc.; Roman
Iron Works, Inc.; Achilles Construction Co., Inc.;
Master Iron Craft Corp., and the Peelle
Company, Respondents,
Shopmen's Local Union No. 455, of the International
Association of Bridge, Structural and Ornamental
Iron Workers, AFL-CIO, Intervenor.
 Nos. 794, 953, Dockets 81-4204, 81-4206.
 United States Court of Appeals,
Second Circuit.
 Argued April 8, 1982.
Decided June 7, 1982.
 
 Standau E. Weinbrecht, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C.), for petitioner.
 Stanley Israel, New York City (Kliegman, Goldstein, Israel & Cooper, New York City), for respondents with the exception of Greenpoint Ornamental and Structural Iron Works, Inc., Paxton Metalcraft Corp., and Long Island Steel Products Co.
 Belle Harper, Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, for intervenor.
 Before LUMBARD, FRIENDLY and NEWMAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 These proceedings deal with a 1975 labor dispute concerning a number of small employers in the steel construction and fabricating industry in metropolitan New York. Doubtless to their everlasting regret and certainly to ours, these employers formed a multi-employer bargaining group, the Independent Association of Steel Fabricators, Inc. (the Association), primarily for the purpose of prevailing upon Shopmen's Local Union No. 455, International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO (Local 455), to accept, on behalf of its members, the same terms and conditions of employment that the union granted another multi-employer association, Allied Building Metal Industries, Inc. The employers sought to extricate themselves from the Association when it became evident that its purpose would not be achieved, although Local 455 never advanced any reason why it should not be. In an opinion by the late Judge Gurfein, N.L.R.B. v. Independent Association of Steel Fabricators, Inc., 582 F.2d 135 (2 Cir. 1978), cert. denied, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979), familiarity with which is assumed, dealing with a 1977 decision of the National Labor Relations Board (the Board) relating to this dispute, 231 N.L.R.B. 264, we granted enforcement in part and denied it in part. We said, in a concluding footnote, 582 F.2d at 153 n.37:
 
 
 2
 We would normally remand in this case for further development of facts based on this opinion. Since so much time has now elapsed, however, we must assume that there may presently be continuing relationships of which we are unaware. We shall, accordingly, not formally remand but leave it to the parties to petition the NLRB for such evidentiary hearings, if any, that they desire under the principles outlined in this opinion.
 
 
 3
 The invitation was enthusiastically accepted, as hereafter detailed. In 1980 the Board rendered two further decisions, 252 N.L.R.B. 922 and 904, of which it seeks enforcement. Before the case was reached for argument in this court the Supreme Court on January 12, 1982, decided Charles D. Bonanno Linen Service, Inc. v. N.L.R.B., --- U.S. ----, 102 S.Ct. 720, 70 L.Ed.2d 656, in which it expressly disapproved our holding, 582 F.2d at 148, along with similar decisions by two other courts of appeals, that the Association members were entitled to withdraw from the multi-employer bargaining unit because an impasse in negotiations had been reached. --- U.S. at ---- - ----, 102 S.Ct. at 723-724. By motion dated February 4, 1982, Local 455, which had intervened in the Independent Association case as well as in the Board's present proceedings for enforcement, sought to have us reopen and reconsider our previous decision; this was opposed both by the Board and by the respondents. We find it convenient first to consider the case as we would have done apart from Bonanno and then to discuss what modifications, if any, in that result should be made in light of the Court's recent pronouncement.
 
 I. Summary of our Previous Decision
 
 4
 The Board's original decision issued bargaining orders against 16 members of the Association. In light of our holding that all these employers were entitled to withdraw from multi-employer bargaining because an impasse had been reached, we divided the employers into three classes as follows, 582 F.2d at 149-50:
 
 
 5
 Class I-6 employers who signed collective bargaining agreements with a rival union, Sheet Metal, Alloys and Hardware Fabricators and Warehousemen, Local 810, International Brotherhood of Teamsters (Local 810), before giving Local 455 notice of their intention to withdraw from the Association.[1]
 
 
 6
 Class II-3 employers who signed with Local 810 after giving Local 455 notice of withdrawal from the Association.[2]
 
 
 7
 Class III-7 employers who gave notice of withdrawal from the Association, but signed with neither Local 455 nor Local 810.[3]
 
 
 8
 We adopted a different analysis for each of these classes. As to Class I, we held, 582 F.2d at 149, that the employers violated § 8(a)(5) by failing to give notice of their withdrawal from the Association prior to signing with Local 810.[4] As to Class II, we refused to affirm the Board's findings of § 8(a) (5) violations, 582 F.2d at 151. We held that the Class II employers had not violated § 8(a)(5) by withdrawing from the Association and that the employers had given timely notice of their withdrawal. We also held, however, that these employers "were under a duty to seek bargaining with Local 455 on an individual basis before negotiating with Local 810", 582 F.2d at 151. We held further that if an employer could show either that it entertained a rational, good faith doubt as to Local 455's majority status or that the union actually had lost its majority status, then no § 8(a)(5) violation could be found. Since the Board had refused to consider evidence of the employers' rational, good faith doubts as to Local 455's majority status, no § 8(a)(5) violation could be found on the record before us. After indicating that further evidence might be taken on the question, 582 F.2d at 153 n.37, we said that "(i)n the absence of evidence as to good faith doubt or actual loss of majority status, the Board may find respondents in class two guilty of a refusal to bargain." 582 F.2d at 151.
 
 
 9
 As to Class III, we held, 582 F.2d at 151, that there had been no § 8(a)(5) violations. We reasoned that Local 455's failure to have requested bargaining with the Class III employers on an individual basis following their notices of withdrawal from the multi-employer unit prevented a finding that the individual employers had refused to bargain. Noting that the unfair labor practices of the respondents did not taint election machinery and the "lapse of time and our lack of information concerning current labor relations in the industry", we left it to the Board to consider whether an election or a bargaining order would be a more appropriate sanction against the respondents in Class I and against any respondents in Class II who might be found guilty of § 8(a)(5) violations, 582 F.2d at 152.
 
 
 10
 We later turned to portions of the Board's order which had required the reinstatement of striking employees as unfair labor practice strikers. Stating that in view of our holdings with respect to Classes II and III, "not all respondents' employees became unfair labor practice strikers", 582 F.2d at 152, we said that we would nevertheless "have enforced the Board's reinstatement order against those employers guilty of §§ 8(a)(1), (2) and (5) violations, ... if the record had reflected an unconditional offer to return to work." We found, however, 582 F.2d at 152, that there was no such offer since the letters requesting reinstatement by Local 445 sent in February and March 1976, were accompanied by letters demanding that the employers implement a stipulation negotiated by five members who had remained in the Association, which we held to be not binding on those who had withdrawn, whether lawfully or not, 582 F.2d at 149.
 
 II. The Supplemental Proceeding
 
 11
 On August 18, 1978, Local 455 filed with the Board a motion to reopen the hearing in the proceeding that had been the subject of our Independent Association decision for the purpose of taking evidence with respect to the imposition of bargaining orders upon the employers in Classes I and II. Four months later the General Counsel moved for the issuance of bargaining orders with respect to those in Class II. Orders for a hearing before an administrative law judge (ALJ) were issued on February 1, and April 9, 1979. On February 22, 1980, the ALJ recommended that bargaining orders issue against all Class I employers. Turning to the three Class II employers, he concluded that, at the time when they entered into contracts with Local 810, Koenig did not have, but Cervenka and Master did have good faith doubts that Local 455 represented a majority of their employees; he recommended a bargaining order solely as to Koenig. The Board disagreed with the ALJ's ruling with respect to Master and entered a bargaining order against it, 252 N.L.R.B. 922; it left his conclusion as to Cervenka standing. The Board now seeks enforcement of the bargaining orders against the Class I employers, as well as Koenig and Master.
 
 III. The Separate Proceeding
 
 12
 The Separate Proceeding arises largely out of actions taken by Local 455 after our 1978 decision. In an effort to meet our holding in Independent Association that the 1976 offers to return to work were not unconditional, Local 455, on August 9, 1978, sent each of the employers a letter on behalf of the company's striking employees containing an offer to return to work. The complaint in the Separate Proceeding, in which Local 455 appeared as the charging party, alleged that the employers failed to comply with the offer and that even those striking employees who had been given positions had not received rates of pay and other employment benefits equal to those they had received prior to the commencement of Local 455's strike.
 
 
 13
 Earlier, on July 13, 1978, in another effort to meet our holding in Independent Association, Local 455 made written requests for separate bargaining to four Class III employers-Zaffino, Achilles, Kuno and Peelle. Local 455's complaint in the Separate Proceeding set forth these requests and alleged that the employers had unlawfully refused to bargain.
 
 
 14
 The ALJ recommended that the complaint against Kuno should be dismissed. He found that when Local 455 made its request for bargaining on July 13, 1978, Kuno had only one employee-Ogey Eretzian-and that Kuno had reasonable grounds to believe that he did not wish Local 455 to represent him. He found also that Eretzian and the only other employee at the time of the commencement of the strike, Vogt, had received, since their return to work, the same or greater pay than that they had been receiving under Kuno's 1975 contract with Local 455.
 
 
 15
 With respect to the three other Class III employers named in the complaint, the ALJ found that in July 1978, Achilles and Peelle entertained rational, good faith doubts concerning Local 455's majority status; he found otherwise with respect to Zaffino and recommended that a bargaining order be entered against it.
 
 
 16
 The ALJ also concluded that Zaffino and two Class I employers named in the complaint, Mohawk and Roman, had violated §§ 8(a)(1) and (3) in refusing to reinstate employees who had made an unconditional offer to return to work on August 9, 1978, and directed their reinstatement to their former or equivalent positions and backpay to compensate them for any losses.[5] He also held the three employers liable for backpay to strikers returning before August 9, 1978; he left to the compliance phases of these proceedings determination of the amount of backpay, which is to be calculated based upon the difference, if any, between compensation that strikers received upon their return to work and that which they received prior to Local 455's strike.
 
 
 17
 Exceptions having been filed by respondents, the General Counsel and the charging party, the Board modified the ALJ's decision in a number of respects, see also note 5, supra. It rejected his conclusion that Achilles had not unlawfully refused to bargain in July, 1978. Accordingly, it subjected Achilles to a bargaining order, as well as to one for the reinstatement of strikers and payment of backpay for the period after Local 455's August 9, 1978, offers for strikers to return to work.[6] The Board also reversed the ALJ's conclusion that in July, 1978, Peelle had a good faith doubt as to Local 455's continued majority status and subjected it to a bargaining order. However, it held that Peelle had not violated §§ 8(a)(1) and (3) by refusing to reinstate employees in August, 1978, since, subsequent to the commencement of the strike, Peelle transferred its fabricating operations to Toronto, Canada, reinstated striking employees who offered to return, and hired permanent replacements for the remaining positions available in the warehousing and distribution work left in New York. As to economic strikers who had returned prior to Local 455's August 9, 1978, offer, the Board found Peelle liable for backpay for any differences in compensation between the employees' new jobs and those they held at the commencement of Local 455's strike. The Board reached similar conclusions as to employees who returned to work at Achilles, Master, Roman, Zaffino and Mohawk prior to August 9, 1978. The calculation of the exact amount of the employers' liability was left to the compliance phases of these proceedings. 252 N.L.R.B. at 906 n.5.[7] The Board adopted the ALJ's recommendations regarding the reinstatement of the unfair labor practice striker employees of Mohawk and Roman and issued a similar order against Master.
 
 
 18
 The Board sustained the ALJ's recommendation that the complaint against Kuno be dismissed but upon a different ground. This was that "(t)he Board had long held that it will not certify a union as representative for a one-person unit, and will not find that an employer unlawfully refused to bargain in such a unit."
 
 IV. The Present Proceedings in this Court
 
 19
 On October 23, 1981, the Board petitioned this court to enforce its orders in the Supplemental Proceeding, 252 N.L.R.B. 922, and the Separate Proceeding, 252 N.L.R.B. 904. The respondents filed an opposing brief.[8] The charging party, Local 455, filed no petition to review portions of the Board's decision unfavorable to it, e.g., the refusal to enter bargaining orders against Kuno and Cervenka, to treat employees to Class III respondents as unfair labor practice strikers, and to enter a full reinstatement order against Peelle. However, on February 4, 1982, Local 455 submitted a motion and supporting brief requesting this court "pursuant to its traditional equitable powers and Federal Rule of Civil Procedure 60(b) to reopen and reconsider its prior decision in this case in light of Bonanno Linen Service". Its brief, filed on February 16, 1982, said that "(i)n addition to the questions presented by the NLRB, the following question is presented:
 
 
 20
 Whether the decision of the Supreme Court in Bonanno Linen Service, Inc. v. NLRB (--- U.S. ----, 102 S.Ct. 720, 70 L.Ed.2d 656), 109 LRRM 2257 (January 12, 1982) must be applied in the instant case, making all of the Respondents guilty of violations of § 8(a)(5) of the National Labor Relations Act, by virtue of their unilateral withdrawal from multi-employer bargaining predicated on an alleged impasse in negotiations.
 
 
 21
 and is filled with argument predicated on the Bonanno decision. The Board, on April 5, 1982, filed a response to the motions. Referring to "the adequacy and effectiveness of present remedies provided by Board orders, and consideration of judicial interest in a final resolution of the issues, the Board does not support the Union's motion to reopen and set aside the Court judgment in (this case)." (footnote omitted).[9]
 
 
 22
 V. Respondents' Objections to the Orders in the Supplemental
 
 
 23
 and Separate Proceedings
 
 
 24
 Respondents make numerous objections to the orders in the Supplemental Proceeding and the Special Proceeding. We first discuss objections to the Board's bargaining orders and then turn to its reinstatement orders.
 
 
 25
 As indicated above, our Independent Association decision set out the general legal standards applicable to respondents' refusal to bargain on an individual basis after what we considered to be a justifiable withdrawal from multi-employers bargaining. We said that "(a)s the incumbent union(, Local 455) was entitled to a rebuttable presumption of continued majority status for a reasonable interval after the individual contracts expired on June 30." 582 F.2d at 150. An employer could rebut this presumption "by introducing evidence that the union did not in fact have majority support when (its) refusal (to bargain) occurred or that (its) refusal was founded on a good faith doubt of the union's majority status". 582 F.2d at 150. A successful showing on either count would justify an employer's refusal to bargain and prevent the finding of a § 8(a)(5) violation.
 
 
 26
 Our adoption of the above presumption was grounded in a long line of authority, e.g., N.L.R.B. v. Cayuga Crushed Stone, Inc., 474 F.2d 1380, 1383 (2 Cir. 1973); N.L.R.B. v. Newspapers, Inc., 515 F.2d 334, 341 n.13 (5 Cir. 1975); Retired Persons Pharmacy v. N.L.R.B., 519 F.2d 486, 489 (2 Cir. 1975); N.L.R.B. v. Windham Community Memorial Hospital, 577 F.2d 805, 810-11 (2 Cir. 1978). Given the danger that assertions of the good faith defense would pose to the stability of the collective bargaining process if not carefully scrutinized, see N.L.R.B. v. Tahoe Nugget, Inc., 584 F.2d 293, 303-04 (9 Cir. 1978) ("the presumption ensures the Act's most valued objective: industrial peace"), cert. denied, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979), companies relying on the defense must come forward with easily verifiable and unambiguous evidence supporting their belief that their employees have rejected the incumbent union as a bargaining agent. Thus, the employer has the burden of producing "clear and convincing evidence of loss of union support," Retired Persons Pharmacy v. N.L.R.B., supra, 519 F.2d at 489-90; Nazareth Regional High School v. N.L.R.B., 549 F.2d 873, 880 (2 Cir. 1977). In addition, we have held that determination of the sufficiency of the employers evidence regarding loss of majority status or good faith doubt is a question of fact for the Board which is subject to limited review, N.L.R.B. v. Windham Community Hospital, supra, 577 F.2d 811; Orion Corp. v. N.L.R.B., 515 F.2d 81, 85-6 (7 Cir. 1975).
 
 
 27
 In considering evidence of support for a union we of course look at employee attitudes before an employer's refusal to bargain occurred, e.g., N.L.R.B. v. Newspapers, Inc., supra, 515 F.2d at 342. In addition, in order to establish a good faith doubt, an employer must demonstrate not just the facts indicating a lack of majority support existed, but also that it was aware of those facts, N.L.R.B. v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5 Cir. 1966).
 
 
 28
 Finally, we have been extremely cautious in accepting inferential proof of alleged employee rejection of their union as bargaining agent where the Board has rejected it. We have said, N.L.R.B. v. Windham Community Memorial Hospital, supra, 577 F.2d at 814, that "(i)t cannot be presumed that repudiation of a strike or the willingness to cross a picket line is also repudiation of the Union as bargaining agent." Indeed, courts have recognized that employee support for a union as bargaining agent may well persist even where less than a majority of employees maintain dues payments or union membership. See N.L.R.B. v. National Seal Corp., 127 F.2d 776, 779 (2 Cir. 1942) (L. Hand, J.); N.L.R.B. v. Master Touch Dental Laboratories, Inc., 405 F.2d 80, 83 (2 Cir. 1968); Terrell Machine Co. v. N.L.R.B., 427 F.2d 1088, 1090 (4 Cir. 1970), cert. denied, 398 U.S. 929, 90 S.Ct. 1821 (1970). Indications of employee dissatisfaction or disagreement with strike decisions or other union actions may provide the basis for an inference that the employees no longer want the union as their bargaining agent. However, such evidence of dissatisfaction bears only indirectly on the question of majority support, and will often be entirely consistent with continued employee desire for union representation. In such circumstances, the employer has the burden of producing direct evidence of employee rejection of the union's representation. See N.L.R.B. v. National Seal Corp., supra.
 
 
 29
 We first discuss the Board's treatment of the two Class II employers, Koenig and Master, against whom it entered bargaining orders. The Board concluded that both employers failed to produce evidence sufficient to establish either an actual loss of majority status or a rational, good faith doubt and therefore held that each had violated § 8(a)(5). We uphold both determinations.
 
 
 30
 Application of the principles discussed above leaves no question that the Board properly found that Koenig violated § 8(a)(5). By way of background, throughout the period between June 30, 1975, when the company's contract with Local 455 expired, and January 30, 1976, when Koenig signed its first collective bargaining agreement with Local 810, Koenig employed nine workers in the relevant bargaining unit. By January 30, 1976, three of these employees were no longer actively working, although they had not been discharged and remained part of the relevant unit. See N.L.R.B. v. Windham Community Memorial Hospital, supra, 577 F.2d at 813. Koenig's employees apparently did not participate in the Local 455 strike, 252 N.L.R.B. at 933, although, as detailed below, they observed the union's picket lines.
 
 
 31
 We first consider the argument that evidence of a decline in dues payments by Local 455 members required the Board to conclude that the union actually lost its majority status prior to Koenig's refusal to bargain. Even if we were to assume, contrary to the case law, that decreased dues payments alone can rebut the presumption of a union's majority support, the facts would not support this argument in Koenig's case. The parties agree that five of the nine Koenig workers made no Local 455 dues payments after December of 1975; the remainder of the employees apparently continued payments for some time thereafter. As noted above, in ascertaining employee support for Local 455 we consider the situation prior to the employer's refusal to bargain. The ALJ found that "it was customary for (Local 455 members) to pay (dues) on the last day of the month in which the dues were payable," 252 N.L.R.B. at 933. Consequently, the withholding of the first-and certainly the subsequent-monthly dues payments to Local 455 by the five Koenig workers occurred after the company's January 30, 1976, agreement with Local 810 was signed. Of course, any argument that the post-signing decline in dues payments reflects a pre-signing loss of support by the union must be rejected, since, once Koenig apparently successfully entered into a collective bargaining agreement with Local 810, employees inevitably would perceive Local 455's assistance as ineffectual.
 
 
 32
 The ALJ also found, 252 N.L.R.B. at 933, that members of Local 455's parent union-the International Iron Workers-retained union membership for six months after their last dues payment. Thus, even the five employees who ultimately ceased paying dues to Local 455 remained members of the union on January 30, 1976.[10] We think the foregoing facts not only fail to rebut the presumption of Local 455's continuing majority support prior to January 30, 1976, but in fact support it. Since Koenig introduced no other evidence[11] bearing on Local 455's loss of support among its employees we must uphold the Board's finding that the company failed to show that Local 455 actually lost its majority status.
 
 
 33
 The record also firmly supports the Board's determination that Koenig lacked a rational, good faith doubt as to Local 455's majority status. First, Koenig introduced virtually no evidence-even as to the alleged pre-signing decline in dues payments-of the company's knowledge of facts indicating that the union was losing its majority status, see N.L.R.B. v. Gulfmont Hotel Co., supra. In addition, one incident relied upon by Koenig merits discussion in greater detail. Although Koenig's employees did not participate in Local 455's strike, they honored the union's picket lines by reporting for work assignments at a site several blocks from Koenig's shop, suggesting at least some commitment to the union. In the evening of January 29, 1976-the day before the company signed with Local 810-Koenig's employees received phone calls at their homes instructing them, contrary to customary practice, to report directly to Koenig's shop to receive their work assignments.[12] Upon their arrival at the plant the next morning the employees were met by the President and Vice-President of Koenig and two or three representatives of Local 810. The workers were told that henceforth they would be represented by Local 810, although first they would be required to picket Koenig's shop, for "five minutes." The employees, provided with Local 810 signs by the union's representatives, complied with their instruction and picketed the plant for five or ten minutes. They then returned to the company's office and, together with the President of Koenig, signed the Local 810 collective bargaining agreement. We agree with the ALJ and the Board that this clumsily orchestrated showing of "support" for Local 810 is both inconsistent with any notion of a good faith doubt as to Local 455's majority status and is of virtually no probative value in determining employee support for Local 455. See also N.L.R.B. v. Sky Wolf Sales, 470 F.2d 827, 830 (9 Cir. 1972); Clear Pine Mouldings, Inc. v. N.L.R.B., 632 F.2d 721, 730 (9 Cir. 1980) ("employer activity aimed at causing disaffection from the union" cannot provide basis for showing of lack of majority support for union), cert. denied, 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981).
 
 
 34
 We also agree with the Board's conclusions regarding the other Class II employer-Master. On June 30, 1975, when the contract between Master and Local 455 expired, the company employed seven unit workers, five of whom were actively working. By January 28, 1976, when Master signed its first collective bargaining agreement with Local 810, only three of the employees were actively working; they apparently comprised the company's entire workforce. All seven of Master's employees remained members of Local 455 until after January 28, 1976: four ceased making dues payments in January of 1976, and the others ceased in September, November[13] and December of 1975-all within the union's six-month grace period for delinquent dues payments. For the reasons set forth in our discussion of Koenig, we think that this decline in dues payments, which, for the most part, occurred after the January, 1976, signing with Local 810, is of little relevance to Local 455's pre-signing majority status in Master's shop.
 
 
 35
 Master's attempts to rebut Local 455's presumption of majority status focus principally upon a single episode. In late December of 1975, Mr. Scheiner, President of Master, was approached by a representative of Local 810 who claimed that his union, and not Local 455, represented a majority of Master's employees; Scheiner says he "put off" the representative and took no action in response to the claim. In January of 1976, however, the representative returned and produced Local 810 representation cards apparently signed by the three active Master employees, although Scheiner never verified this. Shortly thereafter Master signed a collective bargaining agreement with Local 810.
 
 
 36
 We note that signed representation cards of a rival union are far better evidence of a loss of majority support than a decline in dues payments or half-hearted picketing, particularly if the employer verifies the cards' accuracy and inquires into the circumstances surrounding their signing. Representation cards-unlike declining dues payments and limited picketing-generally are unambiguous indications that employees have rejected the union itself as their bargaining agent, and not that they merely are dissatisfied with or uncommitted to certain of its policies.
 
 
 37
 Nonetheless, while we think the question is a close one, we conclude that the Board was justified in holding that Master failed to produce sufficiently "clear and convincing evidence", 519 F.2d at 489-90, to rebut Local 455's presumption of majority status. The Board explicitly held that the relevant bargaining unit consisted of all seven striking employees.[14] The Board is generally permitted considerable discretion in its definition of bargaining units, N.L.R.B. v. Hudson River Aggregates, 639 F.2d 865, 871 (2 Cir. 1981); N.L.R.B. v. Windham Community Memorial Hospital, supra, 577 F.2d at 813, and we see no reason to interfere with its judgment here, particularly in view of the Supreme Court's recent reaffirmance of the policy of deferring to the Board's expertise, Charles D. Bonanno Linen Service, Inc. v. N.L.R.B., supra. In addition, the respondents do not seriously challenge the Board's bargaining unit definition; in the light of all this, we think a seven person unit was appropriate. Since the record contains virtually no evidence indicating a rejection of Local 455 by the four inactive employees prior to January 28, 1976, we conclude that the respondents failed to demonstrate that Local 455 had lost its majority status. See Retired Persons Pharmacy v. N.L.R.B., 519 F.2d 486, 490 (2 Cir. 1975) ("The employer may rebut the presumption of continued majority status only by showing objective grounds for doubting that a majority of employees support the union." (emphasis in original)).
 
 
 38
 As regards the existence of a rational, good faith doubt as to Local 455's majority status, we again hold that Master failed to satisfy the heavy burden that it faced. As noted above, the signed representation cards are the type of objective evidence we think generally is necessary to sustain a good faith doubt defense. Despite this, the three cards presented to Master's president failed to demonstrate a loss of majority support. As the Board concluded, 252 N.L.R.B. at 923, there simply was no probative testimony regarding the views of the remaining four Master employees, much less of Master's knowledge of such views. For example, there is no testimony that Master was aware of any decline in its employees' dues payments to Local 455. Moreover, so far as the record reveals, Master made no attempt to contact any of the workers or otherwise ascertain their views. In the light of all this we think the Board's conclusion that Master failed to show a rational, good faith doubt as to Local 455's majority status was supported by substantial evidence in the record.
 
 
 39
 The Board also found that three of the Class III employers-Achilles, Zaffino and Peelle-had committed § 8(a)(5) violations by refusing to bargain individually with Local 455 when the union requested such bargaining after our Independent Association decision was handed down in 1978. As with the Class II employers, Achilles, Zaffino and Peelle claim that Local 455 lacked majority support among their employees or, alternatively, that they had an objective basis for doubting the union's majority status. Again, we conclude that the record contained substantial evidence supporting all the Board's findings.
 
 
 40
 On the date its last contract with Local 455 expired-June 30, 1975-Achilles employed seven unit workers. The ALJ, who concluded that Achilles had not violated § 8(a)(5), apparently thought that four of the seven members of the bargaining unit had renounced their support for Local 455, 252 N.L.R.B. at 914. In addition, he emphasized that Local 455 engaged in very little picketing at the Achilles shop during 1977 and 1978.[15] Finally, the ALJ relied upon "the lapse of time" in absolving Achilles of any unfair labor practices for its refusal to bargain.
 
 
 41
 The Board, which reversed the ALJ, rejected his reliance upon the lapse of time between the 1975-76 strike and the employer's 1978 refusal to bargain. The Board noted that during this period Local 455 was actively involved in litigation on behalf of Achilles' employees and, in addition, conducted occasional picketing and held meetings with Achilles' workers. The Board therefore distinguished, properly we think, this case from New York Printing Pressmen and Offset Workers Union, No. 51 v. N.L.R.B., 575 F.2d 1045, 1948-49 (2 Cir. 1978), where it had held that a lapse of nine months in which the union did nothing at all to seek employee support or to advance employee interests was a factor contributing to a rational, good faith doubt as to the union's majority status.[16]
 
 
 42
 The Board also concluded that the ALJ had erred in apparently treating two employees who retired from Achilles to take Local 455 pensions as being replaced by workers who would not support the union. It is undisputed that, of the original seven unit employees, three have remained active and continued to pay Local 455 dues throughout these proceedings. App. at 632-35; Respondent's Brief at 18. If, therefore, one assumes that the retired workers were not replaced and that the bargaining unit was reduced to five employees, Local 455 had a three to two majority. The same conclusion is reached if one accepts the ALJ's use of a seven person unit. The Board, citing its use of the approach elsewhere, James W. Whitfield d/b/a Cutten Supermarket, 220 N.L.R.B. 507, 508-09 (1975); Surface Industries Inc., 224 N.L.R.B. 155 (1976); Windham Community Memorial Hospital and Hatch Hospital Corp., 230 N.L.R.B. 1070 (1977), enf'd, 577 F.2d 805 (2 Cir. 1978), relied upon a presumption that newly hired employees support the incumbent union in the same proportion as those they replace.[17] This presumption, which we think is consistent with the need to scrutinize carefully assertions of the good faith defense, provides Local 455 with majority status-five of seven workers. Even absent this presumption, however, Achilles did not come forward with evidence regarding the attitudes of the new employees, if any, and thus failed to demonstrate that Local 455 lost its majority status.
 
 
 43
 We also conclude that the Board properly found that Achilles lacked an objective basis for its asserted good faith doubt regarding Local 455's majority status. So far as we can tell from the record, only one employee-Douda-was working at Achilles in July, 1978. The record contains no evidence that Achilles had any knowledge at all-including knowledge of any decline in dues payments-regarding the sympathies of the remainder of the unit and, thus, we conclude that Achilles failed to demonstrate a rational, good faith doubt as to the union's majority status.[18]
 
 
 44
 We also conclude that the Board properly found that Peelle had violated § 8(a) (5). In June of 1975, when its last contract with Local 455 expired, Peelle employed approximately 37 unit workers at its New York plant. Shortly after the Local 455 strike began, Peelle ceased manufacturing in New York. It shifted these operations to its Toronto, Canada, plant and accommodated the new work by increasing productivity and hiring more workers. Picketing nonetheless continued at the New York plant for several hours each week until our decision was handed down in June, 1978; thereafter it apparently was discontinued. The vast majority of Peelle's workers ceased paying dues to Local 455 in 1976 and 1977. By July, 1978, when Local 455 requested separate bargaining, only seven employees remained current in their payments; four of these were on pension. The delinquent employees seem to have been suspended from the union, although the record does not reveal when.
 
 
 45
 While the foregoing certainly throws the employees' enthusiasm for Local 455 into question, the Board reversed the ALJ's determination that Peelle had a rational, good faith doubt as to the union's majority status. The Board reasoned, as it has elsewhere, Orion Corp., 210 N.L.R.B. 633 (1974), enf'd, 515 F.2d 81 (7 Cir. 1975), that a decline in dues payments and union membership are not determinative of employee support for the union, see pp. 138-139, supra. Despite the considerable number of employees who ceased paying dues, we think the Board's conclusion was justified on the facts before it. Proof of a decline in dues payments may create an inference of employee rejection of the union, which in some circumstances may be sufficient to sustain the employer's burden of proof of loss of majority status. As regards Peelle, however, this method of inferential proof is seriously flawed, because of the existence of alternative explanations for the decline in dues payments. First, this case involves employees who likely are financially pressed after a lengthy strike, and some of the failures to make dues payments may be due, at least in part, to inability rather than to dissatisfaction with the union. More important, the decline in dues payments occurred when Peelle apparently had successfully countered the union's strike by transferring its operations to Canada, thus making any further relationship between most of the workers and the company unlikely. In cases where the members of a bargaining unit maintain a continuing relationship with an employer, the cessation of dues payments arguably indicates rejection of the union as their bargaining agent: the employees' decision may suggest a desire to deal directly with their employer, or to join another union. In this case, however, where the prospects of a continuing relationship with Peelle were slim, a decline in dues payments does not imply a desire to deal with another union or a desire to deal directly with Peelle. Rather, it implies that employees had made an entirely rational calculation that, since Peelle had relocated its plant, Local 455 probably could not provide them with benefits equal to the dues it demanded. Despite this, however, it is quite likely that the employees, if the question were put to them, would have supported the union's continued representation of any of their interests that might be pursued against Peelle. While the union's chances of success in advancing the employees' interest plainly were perceived as minimal, and not even worth paying dues for, the chances of obtaining any benefits from Peelle without the union were non-existent. The situation is thus vitally different from cases in which employees retain a continuing relationship with an employer, and in rejecting a union opt for an alternative means of representation.[19] Peelle produced no evidence bearing on this issue of actual employee support for the union. Indeed, the record contains no evidence that Peelle had any knowledge of the decline in dues payments, or of any other facts indicating a loss of employee support for the union. In the light of this, we think the Board's findings that Peelle failed to rebut the presumption of continuing majority support for Local 455 and that Peelle failed to prove an objectively-based, good faith doubt as to the union's majority status were supported by substantial evidence.[20]
 
 
 46
 Zaffino, the third of the Class III respondents, employed eight workers at the commencement of Local 455's strike. Four of these have maintained their membership in the union throughout these proceedings and a fifth was apparently a member when Local 455 made its July, 1978, demand for individual bargaining with Zaffino. Faced with conflicting testimony, the ALJ concluded that sporadic picketing occurred at the Zaffino shop until sometime in 1978. We reject the company's argument that limited picketing indicates a lack of employee support for the union. As noted above, dissatisfaction with a particular policy or strike alone is insufficient to establish rejection of the union. Zaffino produced no other evidence of dissatisfaction with the union, much less the clearly verifiable and unambiguous evidence of a loss of majority support which we have said, p. 138, supra, is necessary in this context. We hold that the Board's findings that evidence of light picketing and declining dues payments failed to rebut the presumption of continued majority support for Local 455 or to provide sufficient basis for a rational, good faith doubt as to the union's majority status were correct.
 
 
 47
 As noted above, in our earlier Independent Association opinion decision we instructed the Board to consider whether, "in view of the fact that the unfair labor practices did not taint election machinery, and because of the lapse of time and our lack of information concerning current labor relations ... an election rather than an order to bargain with Local 455 might be a more appropriate sanction." 582 F.2d at 151. The Board, after holding that the two Class II employers and the three Class III employers had violated § 8(a)(5) by refusing to bargain with Local 455, concluded that bargaining orders were more appropriate remedies for these unfair labor practices than new elections. The Board reached the same conclusion with respect to the six Class I employers found to have violated § 8(a)(5) in the first Independent Association opinion. 582 F.2d at 149.
 
 
 48
 The Board adopted a single rationale for all the employers. Relying on its decision in Glomac Plastics, Inc., 241 N.L.R.B. 348, enf'd, 600 F.2d 3 (2 Cir. 1979), the Board argues that a bargaining order "is the only effective remedy" for the refusal to bargain, id. at 348. While recognizing that the passage of time since the unfair labor practices occurred is "unfortunate", the Board reasons that merely to order a new election "would give an employer an incentive to disregard its duty to bargain in the hope that over a period of time a union will lose its majority status or abandon the unit ...." Id. In accepting this rationale in Glomac Plastics we found it sufficient if, as we assumed, "the Board did not decline to assert its discretion concerning the remedy, but simply concluded that under the circumstances of this case, the remedy was thought appropriate even if the Company's evidence of intervening circumstances were accepted as an offer of proof." Glomac Plastics, Inc. v. N.L.R.B., 600 F.2d 3 (2 Cir. 1979). In fact the Board seems here to have come perilously close to a universal rule, but no closer than it did in Glomac where we granted enforcement. In addition the Board has powerful support in N.L.R.B. v. Katz, 369 U.S. 736, 748 n.16, 82 S.Ct. 1107, 1114 n.16, 8 L.Ed.2d 230 (1962); see also N.L.R.B. v. J. H. Rutter Rex Manufacturing Co., 396 U.S. 258, 264-65, 90 S.Ct. 417, 420-421, 24 L.Ed.2d 405 (1969); N.L.R.B. v. Staub Cleaners, Inc., 418 F.2d 1086 (2 Cir. 1969). Deference to the Board on this issue finds implicit endorsement in Bonanno Linen Service, Inc. v. N.L.R.B., supra, --- U.S. ----, 102 S.Ct. 720, 70 L.Ed.2d 656, where the Supreme Court, in an opinion placing particular emphasis on the importance of recognizing the Board's expertise, enforced an order to bargain relating to events that occurred some six years previously.
 
 
 49
 In the light of all this, the Board's bargaining orders must be enforced. The Board's opinion demonstrates that it considered the developments that have intervened since the respondents' unfair labor practices occurred, 252 N.L.R.B. at 931-32, and nonetheless concluded that the need to deter employer misconduct mandated the issuance of bargaining orders. Under governing decisions of the Supreme Court and our own its judgment was neither arbitrary nor capricious.
 
 
 50
 Finally we turn to the Board's treatment of the reinstatement of returning strikers. The Board held, in the Separate Proceeding, 252 N.L.R.B. 922, that two Class I employers (Mohawk and Roman) and one Class II employer (Master) were required immediately to reinstate their striking employees. 252 N.L.R.B. at 906-07. Because the strikes were deemed to have been converted into unfair labor practice strikes the employers were required to dismiss, if necessary, employees hired subsequent to the signing of the collective bargaining agreement with Local 810 in order to create positions for the returning strikers. Id. The Board also held that two Class III employers (Achilles and Zaffino) were required to reinstate their striking employees.[21] The employees were not, however, treated as unfair labor practice strikers and, therefore, no dismissals were required for the returning workers. Lastly, the Board held that, as regards certain strikers who have already returned to work, all six of the above-mentioned employers (Achilles, Zaffino, Peelle, Master, Roman and Mohawk) were required to but may have failed to reinstate these workers to positions equivalent to those they occupied when the strike began. 252 N.L.R.B. at 906 n.5. We hold that each of the Board's findings was supported by substantial evidence.
 
 
 51
 There is little dispute regarding the general legal principles governing reinstatement. Employees who take part in an unfair labor practice strike are entitled to immediate reinstatement, even if replacements have been hired, provided that they make an unconditional offer to return to work. Mastro Plastics Corp. v. N.L.R.B., 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956); N.L.R.B. v. Acme Wire Works, Inc., 582 F.2d 153, 158-59 (2 Cir. 1978). Economic strikers who make an unconditional offer to return to work are entitled to their former position (or a substantially equivalent one) if it remains available; if permanent replacements have been hired, the striker is entitled to the position when a replacement departs, unless he has taken equivalent employment elsewhere or unless the employer establishes a substantial and legitimate business reason for refusing reinstatement. N.L.R.B. v. Great Dane Trailers Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 119 L.Ed.2d 614 (1967).
 
 
 52
 After our first Independent Association decision, Local 455 sent letters to each of the six employers identified above requesting that striking employees be reinstated. The letters, which were addressed to each employer individually, were mailed August 9, 1978, and contained identical language, providing, in pertinent part:
 
 
 53
 We are requesting on behalf of your striking employees that they return to work at their previous jobs or ones substantially similar.
 
 
 54
 This offer to return is unconditional and is a continuing one. (Emphasis in original.)
 
 
 55
 Counsel for the respondent employers replied by letter, saying "(w)e would appreciate you advising as to the nature of the 'unconditional' offer." The letters continued:
 
 
 56
 Specifically, we would appreciate answers to the following questions:(1) Under what wage and benefit conditions are the employees offering to return? In view of the fact that there is not and has not been a collective bargaining agreement with you covering these employees for in excess of 3 years, do you or any of the employees claim that contributions would be due to the various Local 455 funds in the event of re-employment.
 
 
 57
 (2) What are the names of the employees offering to return and when will they be available?
 
 
 58
 No commitment to reinstate was made.
 
 
 59
 The union's clarification explained that "(t)he blanket unconditional offers to return made by the Union on behalf of the strikers were made in accordance with the law as laid down in N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614, and Laidlaw Corp. v. N.L.R.B., 7 Cir., 414 F.2d 99, cert. den. 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100. We seek the rights therein enunciated." The Union's letter also said: "the offer was made on behalf of all employees on the seniority list of the respective companies at the end of the day preceding the day the strike commenced, which was July 1, 1975." Counsel for respondents demanded yet further clarification, which apparently was not provided.
 
 
 60
 The union clearly had standing to make the request for reinstatement on behalf of the employees it had represented. Newspaper Production Co. v. N.L.R.B., 503 F.2d 821, 829 (5 Cir. 1974); N.L.R.B. v. Brown and Root, 203 F.2d 139, 147 (8 Cir. 1953). In addition, coming as they did only shortly after our Independent Association decision was handed down, Local 455's offers were timely. Respondents argue that the offers were offers "in form" only, and not "in fact", apparently because they were broadly worded. The Board adequately meets this point by noting that details regarding entitlement to reinstatement and the exact details of reinstatement can easily be resolved after an employer agrees to the return of strikers, or, if necessary, in compliance hearings before the Board, N.L.R.B. v. Acme Wire Works, 582 F.2d 153, 159 (2 Cir. 1978); N.L.R.B. v. C.C.C. Associates, Inc., 306 F.2d 534, 539-40 (2 Cir. 1962).
 
 
 61
 Lastly, the respondents argue that Local 455's offers were not "unconditional". More specifically, the employers argue that the offers to return were conditioned on the reinstatement of all striking employees of all the employers and on the employers making pension fund contributions on behalf of the returning employees. The letters containing Local 455's offer on behalf of its members do not support this contention. In addition to making no mention of any express conditions on the return of the striking employees, each of the letters states that the offer made is unconditional. Each of the six employers received individual letters which made no reference to the letters sent to other employers, thus leaving little basis for an inference that the union intended that the return of unfair labor practice strikers be conditioned upon the return of economic strikers. The respondents' reliance upon ambiguous language in Local 455's clarifying letter, see p. 146, supra, must be read with that letter's emphatic reiteration that the offer was a "blanket unconditional offer".[22] Thus, we hold that the Board properly concluded that the offers made to the various employers in August, 1978, were unconditional.
 
 
 62
 Finally, we think there was substantial evidence in the record to support the Board's determination that the respondents' reinstatement of a number of their employees, following their individual offers to return to work, at levels of benefits inferior to those received at the commencement of the Local 455 strike constituted violations of § 8(a)(5). See Laidlaw Corp., 171 N.L.R.B. 1366, 1381-82 (1968), enf'd, 414 F.2d 99 (7 Cir. 1969). Determination of the exact differences in benefit levels and the appropriate remedies for any shortcomings was properly deferred to the compliance phase of the proceedings. N.L.R.B. v. Acme Wire Works, 582 F.2d at 159, N.L.R.B. v. C. C. C. Associates Inc., 306 F.2d at 539-40.
 
 
 63
 VI. The Effect of the Supreme Court's decision in Bonanno
 
 
 64
 We readily agree with Local 455 that, as stated in Bradley v. School Board of City of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory or legislative history to the contrary." Although Bradley involved a statutory change, the Court, quoting Thorpe v. Housing Authority of Durham, 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969), said that its reasoning would equally apply "where the change (in law) was constitutional, statutory, or judicial."
 
 
 65
 However, this principle alone has no practical consequences on the facts of this case. All that is before us is the Board's request to enforce its orders in the Supplemental Proceeding and the Separate Proceeding. This we are granting, for reasons tiresomely explained above. It is of no matter that Bonanno would supply an additional reason for doing this or in some instances support broader relief than the Board granted. A different case would be presented if Local 455 had petitioned for review of some of the Board's ruling, e.g., the refusal to enter a bargaining order against Cervenka because of that company's good faith doubt of the majority status of Local 455. Had that been done, we would have been obliged to apply Bonanno without any need for reopening our earlier decision. Zdanok v. Glidden Co., 327 F.2d 944, 951-53 (2 Cir. 1964), cert. denied, 368 U.S. 814, 82 S.Ct. 56, 7 L.Ed.2d 22 (1961), which Local 455 cites to us, is authority for that proposition but only for that.
 
 
 66
 In order for Local 455 to derive any benefit from Bonanno, it would thus be necessary for us not merely to apply that decision to issues now before us, as we assuredly would, but, as sought by the union's motion of February 4, 1982, to vacate our decision of June 30, 1978, in N.L.R.B. v. Independent Ass'n of Steel Fabricators, supra, 582 F.2d 135, and redecide that case under the rule enunciated by the Supreme Court three and a half years later. F.R.Civ.P. 60(b), which Local 455 cited to us, is not applicable by its terms since it relates only to district courts, see F.R.Civ.P. 1. However, we will assume in Local 455's favor that court of appeals has similar power to reopen its own judgment. The exercise of any such power, like that under F.R.Civ.P. 60(b), see 7 Moore, Federal Practice P 60.19 (1979), is discretionary.
 
 
 67
 We find abundant reason for not exercising such power in this case. For the Class III respondents which had not been found guilty of any unfair labor practice this case terminated four years ago. As said in Collins v. City of Wichita, 254 F.2d 837, 839 (10 Cir. 1958):
 
 
 68
 Litigation must end some time, and the fact that a court may have made a mistake in the law when entering judgment, or that there may have been a judicial change in the court's view of the law after its entry, does not justify setting it aside.
 
 
 69
 Moreover, a decision on our part to reopen the Independent Association decision to take account of Bonanno would not automatically result in a conclusion that all employers who withdrew from multi-employer bargaining after the reaching of an impasse had violated § 8(a)(5) and that their striking employees thereupon became unfair labor practice strikers. As we noted, 582 F.2d at 148, respondents had raised other contentions, namely, "that there were other 'unusual circumstances' warranting their departure such as dire economic conditions and alleged surface bargaining on the part of Local 455", which we had found it unnecessary to reach. Moreover, the Board does not want us to reach them without a remand to it. As it said in its response to Local 455's motion, fn. 10, "To reopen the proceeding would necessitate a remand to the Board for further findings".
 
 
 70
 The apparent reason for this is that while the Board has adhered, and has now been upheld in adhering, to the view taken in Hi-Way Billboards, Inc., 206 N.L.R.B. 22 (1973), that an impasse alone is not an unusual circumstance justifying unilateral withdrawal from multi-party bargaining by either an employer or the union, it has been equally strong in recognizing that withdrawal should be permitted in cases where, as it said in Bonanno, 243 N.L.R.B. at 1093, "consensual employer withdrawals through separate bargaining have so depleted a unit that it would be 'unfair and harmful to the collective-bargaining process' not to permit one or more of the remaining employers to withdraw". Although the ALJ's decision in the Independent Association case, supra, 231 N.L.R.B. at 282-83, which the Board adopted, contains some discussion of the subject, the Board evidently now is not satisfied with this, as witness the above quoted statements of its Deputy Associate General Counsel, and his further statement (p. 5) that "if the Board initially had viewed the facts of this case as the Court did it arguably would have reached a different result", citing Connell Typesetting Co., 212 N.L.R.B. 918 (1974), and N.L.R.B. v. Southeastern Colorado Contractors Ass'n, 447 F.2d 968 (10 Cir. 1971), the latter of which we had also cited, 582 F.2d at 148. If we were to reopen the Independent Association decision in order to take account of Bonanno, the Board also might wish to consider whether the Supreme Court's opinion in Bonanno envisions a per se rule that a union's consent to a "separate final" agreement, as distinguished from an interim agreement, with one employer fragments multi-employer bargaining; whether the agreements which Local 455 executed with Dextra and Atwater, see 582 F.2d at 140-41, in this case were of that character (as the one with Dextra seemingly was, see J.App. in 77-4198 at 215-16); and what proportion of the total number of employees these companies had. Whatever the Board's reasons, we would find it difficult to conclude, on the papers before us, that a remand should not be granted before we could consider applying Bonanno to the instant case when counsel for the Board says that it should be. In any event a remand would almost certainly be needed if we decided to give effect to Bonanno. We likewise agree with the Board that such a remand or remands, with the consequent further expenditure of the time and resources of the Board and the respondents, many of which apparently are in straightened circumstances, see 231 N.L.R.B. at 281, 283, on a dispute which occurred nearly seven years ago, which, even then, involved only some 250 employees, and which has now been resolved broadly in favor of the union and its members, see note 9, supra, would not be in the public interest. Recognizing that, as held in International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, Local 133, UAW, AFL-CIO v. Fafnir Bearing Co., et al., decided with International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, Local 283 v. Scofield, 382 U.S. 205, 220, 86 S.Ct. 373, 382-383, 15 L.Ed.2d 272 (1965), public and private interests "interblend in the intricate statutory scheme" of the National Labor Relations Act, we think that in deciding whether to exercise a discretionary power to reopen a decision now four years old, we may give the public interest, as represented by the Board, predominant weight.
 
 
 71
 The orders of the Board in the Supplemental and Separate Proceedings will be enforced. The motion of Local 455 to reopen our decision in the Independent Association case is denied.
 
 
 72
 LUMBARD, Circuit Judge, concurring and dissenting:
 
 
 73
 I agree with all of the court's opinion except the acceptance of the Board's treatment of The Peelle Co. I would not grant enforcement as to that employer.
 
 
 74
 The Peelle Co. was a "group III" employer which this court held legitimately left the multi-employer bargaining group in 1978. N.L.R.B. v. Independent Ass'n of Steel Fabricators, Inc., 582 F.2d 135 (2 Cir. 1978), cert. denied, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979). The only charge against Peelle is that it refused to bargain with Local 455 and that it lacked "a rational, good faith doubt as to the union's majority status." The administrative law judge found Peelle had such a rational good faith doubt, and his decision is supported by the record. The Board reversed, citing to nothing in the record, ignoring the procedural history of this case and failing to deal with the most important basis for the administrative law judge's decision. The majority enforces the order against Peelle not because it finds evidence in the record or support in the law for the Board, but because it can posit hypothetical facts beyond the record that might support the Board.
 
 
 75
 The administrative law judge found for Peelle because much time had passed since Peelle had negotiated with Local 455, because picketing had ceased and because 30 of the 37 employees allegedly represented by Local 455 had ceased paying dues and had been suspended by the Local. Of the seven active members, four were on pension.
 
 
 76
 The Board reversed. It ruled that passage of time was not probative of Peelle's "good faith rational doubt" as to Local 455's majority status notwithstanding-and without mentioning-that Peelle refused to bargain:
 
 
 77
 -three years after the expiration of its last contract with Local 455;
 
 
 78
 -one year after Local 455 struck;
 
 
 79
 -six months after Peelle legitimately left the multi-employer group bargaining with 455;
 
 
 80
 -four weeks after this court suggested that the passage of time might have diminished support for Local 455. Id. at 151.
 
 
 81
 The Board nowhere deals with the administrative law judge's determination that, by suspending 30 of 37 members for non-payment of dues, Local 455 might logically be considered to have lost the allegiance of the men.[1] This point seems to trouble the majority, for it spends two and a half pages suggesting reasons why men suspended for non-payment of dues might still support their union. The majority hypothesizes that the men were financially hard pressed after a long strike and withheld their dues not because they did not support the union but because they could not afford the payments. But the record is silent on this point. Some employees quit paying dues before the strike, others quit during the strike, and some found employment elsewhere.
 
 
 82
 The majority hypothesizes that the employees stopped paying dues as they believed the union could do nothing for them because Peelle had moved its manufacturing operations to Canada. The majority supposes that "it is quite likely that employees, if the question were put to them, would have supported the union's continued representation of any of their interests that might be pursued against Peelle." This does not appear in the record. Indeed, when Peelle declined to bargain with Local 455 it asked the union to provide some evidence that it still had support from the men. The union failed to do so then, and the majority points to no evidence submitted by the union in these proceedings.
 
 
 83
 The majority cites one case to support its hypothetical reasoning, N.L.R.B. v. National Seal Corp., 127 F.2d 776 (2d Cir. 1942). But National Seal Corp., did not involve employees who were actually suspended by their union. There the employer tried to prove the men were suspended because of a clause in the union's constitution, but failed to do so. We subsequently pointed to the absence of discipline for non-payment of dues as showing that employees retained loyalty to a union. N.L.R.B. v. Master Touch Dental Laboratories, Inc., 405 F.2d 80, 83 (2d Cir. 1968). Here we have such discipline. The Board ignored it; the majority does likewise.
 
 
 84
 By enforcing the Board's order against Peelle, the majority rules that a union can suspend the vast majority of union members for non-payment of dues, yet still claim the loyalty of those members and win so long as an appellate panel can dream up reasons neither supported in the record nor enunciated by the Board as to why the workers might still support the union. I cannot agree with such a holding. Like the administrative law judge, I would deny enforcement of the Board's order against The Peelle Company.
 
 
 
 [1]
 These were Roman Iron Works, Inc. (Roman), Melto Metal Products Co., Inc. (Melto), Mohawk Steel Fabricators, Inc. (Mohawk), Greenpoint Ornamental and Structural Iron Works, Inc. (Greenpoint), Long Island Steel Products Co. (Long Island), and Paxton Metalcraft Corp. (Paxton)
 
 
 [2]
 These were Master Iron Craft Corp. (Master), S. Cervenka and Sons, Inc. (Cervenka), and Koenig Iron Works, Inc. (Koenig)
 
 
 [3]
 These were Achilles Construction Co., Inc. (Achilles), Ikenson Iron Works, Inc. (Ikenson), Kuno Steel Products Corp. (Kuno), the Peelle Company (Peelle), Spinger and Sons Structural Steel Co., Inc. (Spinger), G. Zaffino and Sons, Inc. (Zaffino), and Roma Iron Works, Inc. (Roma)
 
 
 [4]
 We also held, 582 F.2d at 143-45, 153, that six employers (Roma, Greenpoint, Long Island, Paxton, Zaffino and Trojan) violated §§ 8(a)(1) and (2) "by interfering with their employees' selection of a bargaining representative and by rendering unlawful assistance to Local 810," and we granted enforcement of the Board's cease and desist orders issued as a result of these findings
 
 
 [5]
 He further concluded that Zaffino's signing a contract with Local 810 in 1976 when it should have been negotiating with Local 455 converted what had been economic strikers into unfair labor practice strikers on that date, but this conclusion was reversed by the Board
 
 
 [6]
 Achilles will be liable only for the "loss of earnings (that employees) may have suffered as a result of the discrimination against them" as strikers, 252 N.L.R.B. at 905, and not as a result of an unavailability of jobs: "Achilles will be permitted to introduce evidence in the compliance stage of this proceeding concerning the existence of jobs for unreinstated strikers at all material times herein." 252 N.L.R.B. at 905 n.4
 
 
 [7]
 The same considerations apply to the economic strikers of these employers as applied to Achilles, see note 6, supra. In addition, the Board said, "(u) nder the circumstances of this case, we hold that Respondents' backpay liability to any employee who returned to work before August 9 shall run only from 6 months prior to the filing of charges herein." 252 N.L.R.B. at 906 n.5
 
 
 [8]
 Greenpoint, Paxton and Long Island were not represented in these proceedings. Apparently they have gone out of business
 
 
 [9]
 Reviewing the case, the Board stated in its response (p. 6):
 Adherence to the "law of the case" would afford the Union substantive benefits and remedies in these proceedings. Of the 18 respondents before the court in the initial proceeding, 11 are required to bargain with Local 455 as a result of the two subsequent Board proceedings. Of the remaining seven, one is a one-man unit, two have no unit employees, one has been found to have substantiated a good faith doubt as to Local 455's majority status, two have signed individual contracts with Local 455, and one is apparently out of business. To the extent the employers are subject to bargaining orders because of unfair labor practices, their employees are entitled to reinstatement (as) unfair labor practice strikers. The employees of other of the employers are also entitled to reinstatement under Board orders based upon findings of illegal refusals to reinstate upon unconditional application.
 
 
 [10]
 In addition there are numerous instances in the record in which members of Local 455 were delinquent in dues payments and later made good their arrears. This suggests that the union was relatively lax in enforcement of its rules regarding the payment of dues, and that the delinquencies that occurred prior to the respondents' refusals to bargain have little probative weight as regards actual employee support for the union. See N.L.R.B. v. Master Touch Dental Laboratories, Inc., supra, 405 F.2d at 83
 
 
 [11]
 We discuss Koenig's reliance upon the "strike" on behalf of Local 810 below. In addition, Koenig argues, Br. at 28, that "there is no evidence to support the proposition that Local 455 represented the majority" of its employees. Even if we were to accept this, it overlooks the presumption of continuing majority status enjoyed by Local 455
 
 
 [12]
 The record is silent regarding who made these calls
 
 
 [13]
 The payment of November dues was made in March of 1976, suggesting continuing union support through at least that date
 
 
 [14]
 The Board included in the bargaining unit the five employees that were active at the commencement of the strike and two other workers "on layoff or leave of absence but with recall rights under the contract." 252 N.L.R.B. at 923
 
 
 [15]
 We agree with the Board that the absence of vigorous or prolonged picketing is generally insufficient independently to meet an employer's burden of demonstrating that a union no longer commands majority support. As pointed out earlier, the rejection of-or more accurately, the absence of affirmative support for-a strike is very different from rejection of the incumbent union. See also Retail, Wholesale & Department Store Union v. N.L.R.B., 466 F.2d 380, 394 (D.C.Cir.1972)
 
 
 [16]
 We also accept, in our treatment of Zaffino and Peelle, the Board's conclusion that the lapse of time was of little probative value
 
 
 [17]
 The Board also suggested that the two employees who retired on Local 455 pensions may have been willing to return to work, 252 N.L.R.B. at 904. The employer introduced no evidence to the contrary
 
 
 [18]
 We also note that Local 455 had long represented respondents' employees, 231 N.L.R.B. at 265, and that it continued its efforts on their behalf in litigation before this Court and the Board: both facts support the presumption of continuing employee support for the union
 
 
 [19]
 Cf. N.L.R.B. v. National Seal Corp., 127 F.2d 776, 779 (2 Cir. 1942) (L. Hand, J.) ("Perhaps these members' failure to pay their dues and their return to work contrary to the union's order were evidence of a desire not to have the union represent them any longer; but that was not the inevitable conclusion; it was possible that they thought that union membership was not worth what it cost and that the union was foolish to continue the strike; and yet that they would have welcomed continued representation by the union for as long as it would act for them. The default was consistent with that, and if the respondent meant to prove that the representation had ended, it was obliged to go further....")
 
 
 [20]
 The dissent disagrees with our treatment of Peelle, arguing that the opinion's conclusion as to Peelle rests on "hypothetical facts beyond the record" and "speculation". In particular, the dissent regards our reliance on the undisputed fact that Peelle relocated its operations to Canada shortly after the strike began as speculative
 While the dissent nowhere mentions these principles, it must accept the well-settled rules that the employer has the burden of showing an actual loss of majority support or a good faith doubt, see pp. 137-138, supra, by "clear and convincing evidence", see p. 138, supra, and that the Board's determination of a question of fact to which courts should accord substantial deference, see p. 138, supra. Any absence from the record of evidence bearing directly on the question whether Peelle's employees desired Local 455's assistance as their bargaining agent must be charged to the employer-who had the burden of proof. Having failed to find any direct evidence in the record to support the claim that Peelle's employees no longer desired Local 455 as a bargaining agent, both the dissent and the employer rely on inference from other facts-principally a decline in dues payments. As discussed in text, however, the unusual facts surrounding Peelle-in particular, the relocation of its operations to Canada-seriously attenuate the inference the employer seeks to draw. In observing that the decline in dues payments gives rise to several inferences of roughly equal plausibility we engage in no more speculation than does the dissent when it "hypothesizes" that Peelle's employees no longer wanted Local 455 to attempt to advance their interests against Peelle. Given the existence of equally plausible explanations for the decline in dues payments, we fail to see how Peelle sustained its burden of showing by "clear and convincing evidence" that Local 455 had lost its majority support.
 Although the dissent seems also to differ with the opinion on the question of Peelle's good faith doubt, it points to no evidence regarding what Peelle knew in August of 1978 about employee support for Local 455. As discussed in text, Peelle's knowledge of minimal picketing is insufficient to sustain a rational, good faith doubt. The importance the dissent attributes to the union's refusal to respond to a request by Peelle for evidence of continued majority status would shift the burden of proof on this issue from the employer to the union-a result at odds with the policies encouraging stable collective bargaining relationships that underlie the well-settled evidentiary rules regarding the good faith doubt defense, see p. 138, supra.
 
 
 [21]
 We describe the Board's treatment of reinstatement issues regarding Peelle at p. 136, supra
 
 
 [22]
 We accept the Board's interpretation of Colavito's testimony at the Separate Hearing regarding the nature of Local 455's offer, 252 N.L.R.B. at 913
 
 
 [1]
 The Board dismissed Peelle's arguments by referring to its determination that Achilles Construction Co., Inc., another Group III employer, failed to establish a reasonable doubt as to Local 455's continuing majority status. But as Achilles, of seven union members two had retired and only two had terminated their membership in Local 455; three of five active workers were still union members in good standing. I do not think the Board's treatment of Achilles suffices to support its order against Peelle, where 30 of 37 employees quit the union